UNITED STATES DISTRICT COURT
FOR THE DISTRICT COURT OF MASSACHUSETTS

| | |
|---|---|
| AMY TUTEUR, M.D.,<br><br>       Plaintiff,<br><br>       v.<br><br>GINA CROSLEY-CORCORAN,<br><br>       Defendant. | )<br>)<br>)<br>)<br>)<br>)   Civil Action No.: 13-cv-10159-MBB<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
AND MEMORANDUM OF LAW IN SUPPORT OF CROSS-MOTION FOR
<u>LIMITED JURISDICTIONAL DISCOVERY</u>**

Respectfully submitted,

<u>/s/ Stephen Riden</u>
Russell Beck (BBO # 561031)
  *rbeck@beckreed.com*
Stephen D. Riden (BBO # 644451)
  *sriden@beckreed.com*
BECK REED RIDEN LLP
155 Federal Street, Suite 1302
Boston, MA 02110
Telephone:  (617) 500-8660
Facsimile:  (617) 500-8665

Dated:  April 5, 2013

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified in the Notice of Electronic Filing and
paper or electronic copies will be delivered to those indicated as non-registered participants on
April 5, 2013.

<u>/s/ Stephen D. Riden</u>
Stephen D. Riden

## INTRODUCTION

Plaintiff Amy Tuteur, M.D. ("Dr. Tuteur"), submits this Memorandum in Opposition to Defendant's Motion to Dismiss (the "Motion to Dismiss") and in support of Plaintiff's Cross-Motion for Limited Jurisdictional Discovery.

This case arises from defendant blogger Gina Crosley-Corcoran's crusade to block Dr. Tuteur from publicly commenting on her own blog about the Defendant or her beliefs. Throughout her campaign, Crosley-Corcoran knew that Dr. Tuteur was a resident of this Commonwealth and that the brunt of the harm caused by her tortious conduct affected Dr. Tuteur in Massachusetts, where she lives and works.  This is not a case where a defendant's mere negligence happened to cause harm in this forum; rather, this is a case where Crosley-Corcoran intentionally targeted Dr. Tuteur in Massachusetts, thereby satisfying the jurisdictional prerequisites.  Consequently, it is fair and appropriate for this Court to exercise jurisdiction over Crosley-Corcoran.

While the facts known to Dr. Tuteur to date are sufficient to establish this Court's personal jurisdiction over Defendant, if this Court determines that further jurisdictional evidence is warranted, Dr. Tuteur respectfully requests limited jurisdictional discovery.

## FACTUAL AND PROCEDURAL BACKGROUND

### *Dr. Amy Tuteur's Background and Credentials*

Dr. Tuteur is a resident of Sharon, Massachusetts and a recognized authority and public health advocate in the field of obstetrics and gynecology.  *See* Dr. Tuteur's Affidavit, ¶¶ 2, 5-8, filed herewith.  After receiving her undergraduate degree from Harvard College in 1979 and her medical degree from Boston University School of Medicine in 1984, Dr. Tuteur practiced obstetrics and gynecology at both Beth Israel Hospital and Brigham and Women's Hospital.

Tuteur Aff. ¶ 3.  As an attending physician at two of the nation's premier hospitals, Dr. Tuteur

worked closely with many of the country's top physicians, delivered thousands of babies, and

gained valuable, first-hand knowledge about the serious risks posed to both mother and baby

during childbirth, especially when such births are performed at home rather than in a hospital.

Comp. ¶ 17; Tuteur Aff. ¶ 4.

Despite leaving active practice in 1994 to raise her family, Dr. Tuteur has remained

involved in her field, and is recognized by some of the best credentialed OB/GYN and news

authorities in the world as an authority on the risks associated with childbirth.  Tuteur Aff. ¶¶ 5-

8.  For example, Dr. Tuteur has been invited to speak at the annual conference of the American

College of Obstetricians & Gynecologists (Western Region) in September 2013, on the topic of

homebirth.  *Id*. ¶ 5.  Time Magazine invited Dr. Tuteur to be a columnist in its on-line Ideas

section where Dr. Tuteur currently maintains her own Ideas page.[1]  *Id*. ¶ 6.  Her work has been

recognized in the New York Times, the L.A. Times, the Times of London, the Boston Globe,

NPR, the Daily Beast, and Newsweek, among others.  *Id*. ¶ 7.  Dr. Tuteur is also the author of the

first fully illustrated guide to pregnancy & childbirth: How your Baby is Born (Ziff-Davis Press

1994).  *Id*. ¶ 8.  Accordingly, when it comes to knowledge and experience on the topic of

homebirth, Dr. Tuteur is a recognized and highly respected authority.

In light of Dr. Tuteur's extensive experience and consequent knowledge of the needless,

serious risks to mother and child associated with home births, Dr. Tuteur has become deeply

troubled by uninformed advocates who attempt to convince women that the risks are in fact not

serious and should be ignored.  Tuteur Aff. ¶ 9.  As a consequence, in 2006, Dr. Tuteur started a

blog known as the "Homebirth Debate," renamed "The Skeptical OB"

---

[1] http://ideas.time.com/contributor/amy-tuteur-m-d/

(http://www.skepticalob.com) in 2008, through which she endeavors to educate the public on the well-established dangers of homebirth, "expose the lies of self-proclaimed homebirth 'midwives', and . . . protect babies who don't have to die."  Compl. ¶17; Tuteur Aff. ¶ 9.

### *Defendant Crosley-Corcoran's Website*

Defendant Crosley-Corcoran, an Illinois resident, is a "blogger" and self-styled birth activist.  Compl. ¶19.  Crosley-Corcoran currently maintains a blog known as "The Feminist Breeder," which she contends is read by "a few million people" at http://thefeministbreeder.com. *See* excerpts from The Feminist Breeder website, Exh. A.  Recently, Defendant moved to a subscription-based website supported by membership fees.  *See id*.  In addition to offering commentary on topics Defendant characterizes as "feminist," The Feminist Breeder contains advertisements, press-kits, and an online store through which Defendant sells a wide variety of merchandise.  *See id*.  Upon information and belief, The Feminist Breeder has subscribers throughout the country, including within Massachusetts, some of whom actively participate in her blog and/or purchase merchandise from the online store.  Tuteur Aff. ¶ 11.

### *Conflict Between Defendant Crosley-Corcoran and Dr. Tuteur*

Crosley-Corcoran uses The Feminist Breeder, as well as her Facebook page (http://www.facebook.com/thefeministbreeder) as a platform to advocate for homebirth.  Compl. ¶ 22-25.  Approaching this emotionally-charged issue from diametrically opposed positions, Dr. Tuteur and Crosley-Corcoran have frequently engaged in spirited debate about the dangers of homebirth.  Through these exchanges, Crosley-Corcoran became aware that Dr. Tuteur was a resident of Massachusetts.  Indeed, at least since February 5, 2011 – nearly *two years prior* to the events giving rise to this action – Defendant was informed on her Facebook page that Dr. Tuteur resided in Massachusetts after asking whether "[a]nybody know[s] if Dr. [Tuteur] is from

[Scranton, PA]? I'm sure she lives somewhere, but I cannot IMAGINE where."  *See* screenshot of Crosley-Corcoran's Facebook page for February 5, 2011, <u>Exh. B</u>.

The parties' ongoing debate became particularly heated in December 2012, in connection with a post on The Feminist Breeder in which Crosley-Corcoran commented on how much she had learned from "experiencing twenty births as a doula."  Compl. ¶¶ 23-24.  Given her grave concern for women who could be swayed by Crosley-Corcoran's uninformed advice, Dr. Tuteur posted commentary on The Skeptical OB suggesting that Crosley-Corcoran's limited experience was an inadequate basis for extolling the purported advantages of birthing at home.  Compl. ¶ 24. Bristling at this criticism, on December 13, 2012, Crosley-Corcoran responded with a post titled "This One's for You, 'Dr. Amy'" in which she leveled *ad hominem* attacks against Dr. Tuteur. The post concluded: "I don't want to leave you without something you can take back to your blog and obsess over, so here's a picture of me, sitting at my dining room table" followed by a color photograph of the Defendant smirking and displaying her raised middle finger (the "Finger Photograph").  Compl. ¶ 25.  The next day, Dr. Tuteur did precisely what Crosley-Corcoran invited her to do:  She posted the Finger Photograph on her own blog, along with commentary about Crosley-Corcoran and links to their running debate.  Compl. ¶ 26.

In response, Crosley-Corcoran posted on her blog that Dr. Tuteur "had committed a VERY serious offense" and noted, "I can't wait to see how this will play out."  Compl. ¶ 29. Thereafter, Crosley-Corcoran sent a cease-and-desist letter through her attorney to Dr. Tuteur. Compl. ¶ 31.  Dr. Tuteur responded, through her attorney husband, and informed Crosley-Corcoran that use of the Finger Photograph was expressly authorized and, in any event, fair use under 17 U.S.C. § 107.  Compl., Exhibit E.

<u>*Crosley-Corcoran's First Takedown Notice*</u>

Undeterred by the lack of legal merit supporting her demand, on or about December 17, 2012, Crosley-Corcoran delivered a "takedown notice" pursuant to the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512(c),[2] to Bluehost.com, the webhosting company that hosted The Skeptical OB, demanding that the Finger Photograph be removed (the "First Takedown Notice"). Crosley-Corcoran Affidavit, ¶ 18. Based on Crosley-Corcoran's allegation of infringement, Bluehost.com threatened to suspend or terminate Dr. Tuteur's website, as a consequence of which Dr. Tuteur temporarily removed the Finger Photo. Compl. ¶¶ 37, 38.

Instructively, conspicuously absent from Crosley-Corcoran's affidavit filed in support of her Motion to Dismiss is any explanation of *how* she knew that Bluehost.com was Dr. Tuteur's webhost. This omission is telling because in order to ascertain the identity of The Skeptical OB's webhost (which is not identified on The Skeptical OB website), a web user must rely on a third-party directory, like the website http://whois.net, which identifies the webhost for a particular URL (here, http://www.skepticalob.com). Such directories, in addition to providing the webhost's name and contact information, provide the name of the registrant (*i.e.*, the blog owner) *along with the registrant's address*. During all relevant times, the publicly-available

---

[2] Congress passed the DMCA in 1998. DMCA section 512(c) identifies a detailed process for a copyright owner who observes infringing content on a website to have the content taken down. 17 U.S.C. §512(c). The copyright owner must send a notification to the webhost (*i.e.*, a "takedown notice") identifying the offending material and asserting under penalty of perjury that the sender is the copyright owner and has a *good faith* belief that the use infringes the sender's copyrights. *Id.* § 512(c)(3). If a qualifying "takedown" notice is delivered, the webhost – in order to terminate its own liability – must expeditiously remove, or disable access to, the allegedly infringing material. *Id.* §512(c)(1)(C). Conversely, copyright owners who abuse the takedown procedure by asserting material misrepresentations in a takedown notice are subject to liability. *Id.* § 512(f).

Importantly, the consequences of a section 512(c) takedown notice are immediate and impactful. Unlike a cease-and-desist letter, which merely puts a party on notice of an alleged dispute, a takedown notice *requires* a webhost to take immediate action and to remove content (or face liability) – regardless on the legitimacy of the claim. For this reason it is ripe for abuse by a would-be silencer. In this regard, Section 512(c) offers a would-be silencer a rather remarkable extra-judicial tool through which to remove content.

registration information for The Skeptical OB included Dr. Tuteur's home address in Sharon, Massachusetts.  *See* Tuteur Aff. ¶ 10; registration info from whois.net, <u>Exh. C</u>; *see also*, 2013 Feminist Breeder Facebook post, <u>Exh. D</u> (demonstrating common knowledge that online users rely on whois.net for these purposes: "it is not hard to find her address…whois.net").  Thus, prior to sending the First Takedown notice, Crosley-Corcoran was almost certainly aware that Dr. Tuteur resided in Sharon, Massachusetts.

On or before December 20, 2012, Crosley-Corcoran's new attorney, Ms. Jake Marcus, located Mr. Tuteur on his law firm's website and learned that he was located in Massachusetts. Affidavit of Jake Marcus, Esq. ¶ 6.  On December 20, attorney Marcus sent a letter to Mr. Tuteur's office *in Boston*.  *Id.* ¶ 7.  After learning that Mr. Tuteur was located in Massachusetts, attorney Marcus continued to exchange correspondence and phone calls with him. *Id.* ¶¶ 8-10.

Furthermore, in response to the First Takedown Notice, on December 22, 2012, Dr. Tuteur submitted a "counter-notice" to Bluehost.com, formally rebutting Crosley-Corcoran's claim of copyright infringement.  Compl, Ex. G.  This counter-notice specifically identified Dr. Tuteur's home address as Sharon, Massachusetts.  *Id.*  Upon information and belief, this form was provided to Crosley-Corcoran by Bluehost.com; just as Bluehost.com provided the First Takedown notice to Dr. Tuteur.  *See* Compl., Ex. G.

<u>*Defendant's Persistent, Targeted Campaign to Silence Her Critic*</u>

On or about January 10, 2013, Attorney Marcus and Attorney Tuteur discussed the matter again.  Attorney Marcus indicated that if Dr. Tuteur was unwilling to assent to Crosley-Corcoran's demand that she agree never to again discuss Defendant on The Skeptical OB (or elsewhere), Defendant would "unleash her vitriol" (or words to that effect).  Compl. ¶ 42.  And that is exactly what happened.  Perhaps in recognition of her lack of legal recourse, Crosley-

Corcoran intensified her course of tortious conduct calculated to threaten and intimidate Dr. Tuteur and impede her ability to publish commentary on The Skeptical OB.

On or about January 18, 2013, Crosley-Corcoran summarized her negotiations with Dr. Tuteur on her blog stating, "I was paying [Dr. Tuteur] an undeserved kindness by offering her the chance *to simply stop badgering me* in exchange for the great deal of money that a judge could make her pay me for trying to profit from my copyrighted work." Comp. ¶ 44.[3]  In other words, in Crosley-Corcoran's own words, her copyright action was merely a means of attempting to extract leverage over Dr. Tuteur to get her "to stop badgering me."  *Id.*  If that were not enough, she concluded her January 18, 2013, post by soliciting her readers to send her their own instances in which Dr. Tuteur allegedly infringed their copyrighted work in an effort to help others file DMCA takedown notices against Dr. Tuteur.  Compl. ¶ 45 & Compl., Exhibit E; Exh. E.  She also asked for contributions to a newly formed legal fund.  *Id.*

On or about January 18, 2013, in order to limit Crosley-Corcoran's ability to further interfere with or disrupt her website, Dr. Amy entered into an agreement with a new web hosting service, DaringHost, and then moved The Skeptical OB to DaringHost.  Compl. ¶ 44.

*Crosley-Corcoran's Second Takedown Notice And*
*Her Admission That She Knew Dr. Tuteur's Home Address*

On January 21, 2013, Crosley-Corcoran admitted on Facebook that "I have 'Dr.' Amy's

---

[3] Ironically, Crosley-Corcoran's attorney, Jake Marcus, submitted an Affidavit in this matter condemning Dr. Tuteur's husband for allegedly revealing settlement negotiations in the Complaint.  No mention is made, however, of the fact that Crosley-Corcoran publicly revealed the substance of these negotiations on her own blog on January 18, 2013 – and for the express purpose of soliciting additional ammunition to badger Dr. Tuteur.  Moreover, even if Crosley-Corcoran had not openly discussed the settlement negotiations, the specific statements made by Ms. Marcus – that Crosley-Corcoran would "unleash her vitriol" on Dr. Amy – do not constitute a settlement offer but, instead, a threat that is beyond the purview of Fed. R. Evid. 408.  *See, e.g.*, *Phoenix Solutions Inc. v. Wells Fargo Bank, N.A.*, 254 F.R.D. 568, 584 (N.D. Cal. 2008) (ruling that threats are not inadmissible under Rule 408 and collecting cases).

home address . . . ." *See* <u>Exh. D</u>.  On the same day, Dr. Tuteur received an email from her new webhost, DaringHost, stating that it had received a notice of alleged infringement from Crosley-Corcoran (the "Second Takedown Notice").  Compl. ¶ 46.  Again, Dr. Tuteur was forced to remove the Finger Photograph or experience "service interruption."  Compl. ¶ 50, 51.  The combination of Crosley-Corcoran's admission that she knew Dr. Tuteur's home address and her delivery of the Second Takedown Notice leaves no doubt that Crosley-Corcoran intended that the effects of her conduct be felt by Dr. Tuteur in Massachusetts.

Further evidence of Crosley-Corcoran's tortious campaign to silence Dr. Tuteur is seen through her commentary on Facebook and The Feminist Breeder (*e.g.*, "Bowing to pressure, 'Dr.' Amy moved her website to a different server yesterday. :)"; "Oh man, [Dr. Tuteur's] brain is going to EXPLODE when she sees what I'm up to."). Compl. ¶¶ 54-56.

During this time, The Skeptical OB suffered periodic outages, for which the following commentary by Crosley-Corcoran plainly reveals knowledge and implies her involvement: "Account Suspended as of 3 pm CST"; "When will a certain person learn that no host in their right mind is going to keep her hateful content on their servers?"; and "I'm preparing for the site to be back up in another 5 minutes, BUT, if she keep on doing what she's doing, this will keep happening."  Compl. ¶¶ 58-60.

These are not the words of an innocent victim of copyright infringement.  Rather, Defendant's commentary evidences her malicious intent to suppress Dr. Tuteur's ability to publish content on the Internet.  Over the course of one month, Crosley-Corcoran sent a cease-and-desist letter, as well as a second demand, issued two fraudulent takedown notices, and initiated an online crusade to crash The Skeptical OB and otherwise interfere with Dr. Tuteur's rights.  Crosley-Corcoran knew and intended the effects of her conduct to be felt by Dr. Tuteur in

Massachusetts.  During this period, Dr. Tuteur was forced to spend countless hours – in Massachusetts – attempting to maintain her website's presence – and thereby her voice – on the Internet.  Tuteur Aff. ¶ 12.  Without an operating website, Dr. Tuteur's ability to convey her message would be diminished — which, not surprisingly was precisely Crosley-Corcoran's intended result.

On January 24, 2013, consistent with Crosley-Corcoran's stated intention of removing Dr. Tuteur's blog from any potential webhost, Dr. Tuteur received a notice from DaringHost that it would no longer host The Skeptical OB.  Compl. ¶ 61.  Meanwhile, despite weeks of alleged "copyright infringement" by Dr. Tuteur, Crosley-Corcoran's never once took steps to actually further exercise her "rights" under 17 U.S.C. § 512 by filing suit.

*Dr. Tuteur's Complaint and Defendant's Motion to Dismiss*

Ultimately, the vengeance with which Crosley-Corcoran pursued her tortious silencing campaign forced Dr. Tuteur to choose between relinquishing control over her website and its content or pursuing a legal remedy.  Accordingly, on January 25, 2013, in order to preserve her ability to convey her message, Dr. Tuteur filed the instant action seeking injunctive relief and damages for misrepresentation of copyright claims under the DMCA and damages for tortious interference with contracts.

On March 5, 2013, Crosley-Corcoran filed her Motion to Dismiss, arguing that this Court does not have personal jurisdiction over her and that the Complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(2).[4]  As demonstrated below, this Court does indeed have jurisdiction

---

[4] Defendant's vitriol has not stopped; it has only expanded into this forum.  Throughout Crosley-Corcoran's Memorandum of Law filed in support of her Motion to Dismiss, Defendant calls Dr. Tuteur "mean," and a "bully."  Of course, others call Dr. Tuteur a life-saver.  Those who understand the risks of homebirth, including many mothers who have lost their babies unnecessarily, recognize that she is committed to protecting innocent infants from grave danger – and unsuspecting parents from a lifetime of

over Crosley-Corcoran and should deny her Motion to Dismiss.

## ARGUMENT

I.    **THIS ACTION SHOULD NOT BE DISMISSED FOR LACK OF PERSONAL JURISDICTION**

### A.    Legal Framework For Personal Jurisdiction in a Federal Question Case

Where, as here, the district court's subject-matter jurisdiction rests wholly or in part on the existence of a federal question, the constitutional limits of the court's personal jurisdiction are drawn in the first instance from the due process clause of the Fifth Amendment.  *United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.,* 960 F.2d 1080, 1086 (1st Cir. 1992), *vacated and remanded,* 987 F.2d 39 (1st Cir. 1993).  The physical scope of this Court's constitutional power is broad.  *Id.*  The Fifth Amendment "permits a federal court to exercise personal jurisdiction over a defendant in a federal question case if that defendant has sufficient contacts *with the United States as a whole,*" *Whistler Corp. v. Solar Electronics, Inc.,* 684 F.Supp. 1126, 1128 (D.Mass.1988), *citing Trans-Asiatic Oil Ltd. S.A. v. Apex Oil Co.,* 743 F.2d 956, 959 (1st Cir.1984) (emphasis added), and that sufficient contacts exist whenever the defendant is served within the sovereign territory of the United States.  *See 163 Pleasant St. Corp.,* 960 F.2d at 1086.

Although there is no direct constitutional check on this Court's exercise of personal

---

grief.  They understand that Dr. Tuteur's use of real life examples of publicly reported preventable homebirths deaths is a powerful tool toward averting future homebirth tragedies.  It is nothing short of ironic that Defendant's Memorandum focuses on Dr. Tuteur's "bullying" tactics when, in fact, Crosley-Corcoran's conduct was replete with threats, intimidation, and aggression.  Although Crosley-Corcoran attempts to create a sympathetic image of herself as an unsophisticated "student and mother of three young children" attacked by the "bully" Dr. Tuteur, the facts paint a very different picture.

As further set forth in Dr. Tuteur's Motion to Strike and Memorandum filed in support thereof (Dkt. #s 15, 16), the Defendant's self-serving rhetoric and *ad hominem* attacks against Dr. Tuteur are designed to distract this Court from the underlying legal issue in this dispute: The Defendant's unlawful use of provisions of the DMCA as a sword to suppress Dr. Tuteur's legitimate right to publish content on the Internet.

jurisdiction over a United States resident in a federal question case, there is a statutory limitation. *Id.* The boundaries of the various federal judicial districts are either congruent with or contained within the borders of the several states, and Rule 4(f) of the Federal Rules of Civil Procedure states the general rule that service of process issued by federal courts must be confined to "the territorial limits of the state in which the district court is held." *Id.* Rule 4(e) of the Federal Rules of Civil Procedure authorizes extraterritorial service, but only where a United States statute provides for such service**.** *Id.*

In cases such as this, where there is no federal statute governing service of process, Rule 4(e) allows extraterritorial service of process to the extent permitted by the law of the state in which the district court sits, *i.e.*, the "long arm" or "transacting business" statute of the relevant state. *Id.* If jurisdiction is proper under the state statute, the court must then determine whether the exercise of personal jurisdiction under the circumstances is consistent with due process under the Fourteenth Amendment. *Id.*

Accordingly, the inquiry comes full circle and, in the instant matter, the court must consider whether the requirements of the Massachusetts Long-Arm Statute, G.L. c. 223A, § 3, and constitutional minimum contacts are satisfied. [5]

**B.     Dr. Tuteur Need Only Meet a *Prima Facie* Standard and All Evidentiary Disputes Must Be Resolved in Her Favor**

Under this familiar analysis, Dr. Tuteur need only meet a *prima facie* standard and proffer evidence sufficient to show personal jurisdiction. *See Foster-Miller, Inc. v. Babcock & Wilcox Canada*, 46 F.3d 138 (1st Cir. 1995). Under the *prima facie* method, this Court is not

---

[5] Thus, even though the familiar Fourteenth Amendment "minimum contacts" doctrine exerts no direct restraint on the federal courts in federal question cases, under the existing statutory framework the minimum contacts analysis acts indirectly "as a precondition to the exercise of personal jurisdiction...." *163 Pleasant St. Corp.,* 960 F.2d at 1086.

required to act as a fact finder, but rather "accepts properly supported proffers of evidence by a plaintiff as true" and construes these facts in the light most favorable to plaintiff's jurisdictional case.  *See id.* at p. 145; *Mass. Sch. of Law at Andover v. ABA*, 142 F.3d 26, 34 (1st Cir. 1998).  "[A]ll evidentiary disputes are resolved in plaintiff's favor."  *Hoffman v. State of Connecticut*, 2009 U.S. Dist. LEXIS 70676 at *12-13; *Foster-Miller, Inc. v. Babcock & Wilcox Canada*, 46 F.3d 138, 145 (1st Cir.1995) (*quoting Boit v. Gar-Tec Products, Inc.*, 967 F.2d 671, 675 (1st Cir.1992) (reasoning that under this standard the court need only "consider ... whether the plaintiff has proffered evidence that, if credited, is enough to support findings of all facts essential to personal jurisdiction").

### C.     This Court Has Specific Personal Jurisdiction Over Crosley-Corcoran

The Massachusetts Long Arm Statute, M.G.L. ch. 223, is coextensive with the jurisdictional limits permitted by the Constitution. *Adelson v. Hananel*, 510 F.3d 43, 48 (1st Cir. 2007).  Consequently, this Court can "sidestep the statutory inquiry and proceed directly to the constitutional analysis."[6]  *Id.*, quoting *Daynard v. Ness, Motley, Loadholt, Richardson & Poole*, *P.A.*, 290 F.3d 42, 52 (1st Cir. 2002).

The legal standard for specific jurisdiction in the First Circuit is well established.  In order to assert jurisdiction, courts in this circuit consider whether a nonresident defendant possesses sufficient contacts with the forum state such that subjecting her to the forum's jurisdiction does not offend "traditional notions of fair play and substantial justice," as

---

[6] Defendant's arguments based on the Massachusetts Long-Arm Statute (Defendant's Memorandum, pp. 7-9) are misleading insofar as Defendant implies that the Massachusetts Long-Arm Statute imposes stricter jurisdictional limits than the U.S. Constitution; it does not.  *See "Automatic" Sprinkler Corp. of Am. v. Seneca Foods Corp.*, 361 Mass. 441, 443 (1972) (the Massachusetts Long–Arm Statute is interpreted to be coextensive with the jurisdictional limits permitted under the U.S. Constitution.).

established by *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citation omitted).

*International Shoe* developed the familiar three part test for determining minimum contacts:  First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities.  Second, the defendant's in-state contacts must represent a "purposeful availment" of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's law and making the defendant's involuntary presence before the state's courts foreseeable.  Third, the exercise of jurisdiction must, in light of certain "Gestalt factors," be reasonable.  *See Int'l Shoe Co.*, 326 U.S. at 316.

### 1.     Dr. Tuteur's Claims Directly Relate to and Arise Out of the Effects of Defendant's Targeted Tortious Conduct.

Courts in the First Circuit have recognized that this is "the least developed prong of the due process inquiry," and that it constitutes, relatively speaking, "a flexible, relaxed standard." *See Bennett v. Jack Dennis Whitewater Trips*, 925 F. Supp. 889, 895 (D. Mass. 1996). Moreover, the "relatedness" inquiry differs depending on the cause of action at issue.  *Levin v. Harned*, 292 F. Supp. 2d 220, 225 (D. Mass. 2003).  In the case of an intentional tort,[7] this Court has held that the relatedness prong may be satisfied by defendant's out of state conduct when plaintiff's claims arise out of, or relate to, the in-forum effects of the defendant's activities.  *See Levin*, 292 F. Supp. 2d at 226-27.  In reaching this conclusion, this Court reasoned that the holding in *Calder v. Jones*, 465 U.S. 783, 789 (1984), often used to analyze the "purposeful availment" prong of the due process inquiry, was relevant to the "relatedness" analysis as well. *Id*.  In *Calder*, the Supreme Court held that California could assert personal jurisdiction over newspapermen in a defamation action based on the "effects" in California of defendants' tortious

---

[7] The First Circuit applies a different inquiry under the relatedness prong depending on whether the claim at issue is contract or tort-based.  *See Levin*, 292 F. Supp. 2d at 225.

Florida conduct "because intentional conduct in Florida was *calculated to cause injury to respondent in California*." 465 U.S. at 789–90 (emphasis supplied). The Supreme Court reasoned:

> [The] petitioners are not charged with mere untargeted negligence. Rather, their *intentional, and allegedly tortious, actions were expressly aimed at [the forum]* ... And they knew that the *brunt of that injury would be felt by respondent in the [forum]* ... An individual injured in [the forum] need not go to the [non-resident's state] to seek redress from persons who, though remaining in [their state], knowingly cause the injury in [the forum].

*Id*. (emphasis added).[8]

In *Levin v. Harned*, this Court for the first time addressed the jurisdictional impact of fraudulent misrepresentations made outside Massachusetts, but expressly aimed at a Massachusetts resident, that caused harm in Massachusetts.[9] 292 F. Supp. 2d at 228. There, defendant antique dealer made allegedly fraudulent representations to the plaintiff's agent *outside of Massachusetts* about the quality and value of certain antiques. *See id*. Defendants argued that Massachusetts lacked personal jurisdiction because the plaintiffs did not allege any related contacts with the forum, such as, telephone calls, mail, or physical presence. *Id*. at 225. In finding personal jurisdiction over the defendants, the court reasoned that the defendant's out-of-state conduct *was for the very purpose of causing harmful effects in the forum*; namely, the Massachusetts plaintiffs would rely on the misrepresentations and the brunt of the financial injury from the alleged fraud would be suffered in Massachusetts. *Id*. at 226-29. This Court

---

[8] The "effects" test was drawn from Section 37 of the Restatement (Second) of Conflicts of Laws, which provides: "A state has power to exercise personal jurisdiction over an individual who *causes effects in the state by an act done elsewhere* with respect to any cause of action arising from these effects unless the nature of the effects and the individual's relationship to the state make the exercise of jurisdiction unreasonable."

[9] In this instance, the alleged violation of § 512(f) is not a copyright claim; rather, Dr. Tuteur asserts a misrepresentation claim. *See Doe v. Geller*, 533 F. Supp. 2d 996, 1004 (N.D. Cal. 2008).

determined that the plaintiffs had met their burden of establishing relatedness because their claims arose out of, and were related to, the in-forum effects of the defendant's conduct.  *See id.*

As in *Levin*, there can be no doubt that Crosley-Corcoran expressly aimed her tortious conduct, *i.e.*, her false takedown notices and her interference with Dr. Tuteur's advantageous relationships, at Dr. Tuteur, and that this conduct was were *for the very purpose of causing harmful effects in this forum*.  *See id*.  In this regard, Defendant knew that The Skeptical OB's webhosts would transmit the fraudulent takedown notice to Dr. Tuteur in Massachusetts.  She also knew that Dr. Tuteur would be forced to take action based on those takedown notices; that is, she would be compelled to remove the Finger Photograph or face losing her ability to publish content on the Internet.  Certainly, Crosley-Corcoran knew and intended that the brunt of her harm – namely, silencing Dr. Tuteur's criticism – would be felt by Dr. Tuteur in her home state. This action is directly related to the Massachusetts effects of Defendant's tortious conduct and, consequently, the relatedness prong of the due process inquiry is satisfied.

> **2.    Being Haled to Massachusetts to Defend this Action was Reasonably Foreseeable.**

The purposeful availment prong of the Due Process inquiry requires consideration of whether the defendant's contacts with the forum represent a purposeful availment of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws and making the defendant's involuntary presence in this state's courts foreseeable.  *See Int'l Shoe Co.*, 326 U.S. at 316.  The "purposeful availment" standard for minimum contacts "is not rigorous, 'casts a wide net,' and may be fulfilled by a single act."  *See Nowak*, 899 F. Supp. at 31-32, *citing Pritzker v. Yari*, 42 F.3d 53, 60 (1st Cir. 1994), *cert. denied* 514 U.S. 1108 (1995); *Burger King v. Rudzewicz*, 471 U.S. 462 (1985).

In intentional tort cases such as the case at bar, courts typically rely on the "effects test"

set forth in *Calder*, *supra*, which finds purposeful availment based on the effects of a defendant's out-of-forum conduct where the defendant (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state. *Calder*, 465 U.S. at 789-90; *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1087-88 (9th Cir. 2000) (reasoning that the exercise of personal jurisdiction over defendant with no direct contact with the forum state is appropriate where "[an] intentional tort was individually targeted at [a] resident of the forum state, and the brunt of the harm was felt there").

In *Bancroft & Masters, Inc. v. Augusta Nat. Inc.*, Bancroft, a California plaintiff, brought suit in California against a Georgia defendant based on a letter that the defendant sent from Georgia to a *Virginia* company, challenging Bancroft's use of a domain name. 223 F.3d at 1087-88. The Ninth Circuit found personal jurisdiction over the defendant, reasoning that the defendant's letter forced California-based Bancroft to take action or lose control of its website. *Id*. The court agreed with Bancroft that the letter, while addressed to Virginia, *was intended to affect, i.e.*, was expressly aimed at, Bancroft in California which constitutes "purposeful availment" under the *Calder* "effects test." *Id.; Calder*, 465 U.S. at 786-790.

This case fits neatly into the "expressly aiming" case law of *Calder* and its progeny. *Calder*, 465 U.S. at 786-790. The presence of individualized targeting easily separates the instant matter from those cases where courts have declined to find personal jurisdiction based on mere untargeted negligence. *See id*. There can be no doubt that the fraudulent takedown notices, while addressed to Dr. Tuteur's webhosts, were expressly aimed at Dr. Tuteur in Massachusetts. *See, e.g., Bancroft*, 223 F.3d at 1087-88. Similarly, Dr. Tuteur was plainly the target of Crosley-Corcoran's tortious efforts to interfere with her webhosts. *Id*. Particularly when all reasonable inferences are drawn in favor of jurisdiction, and in light of the facts demonstrating Crosley-

Corcoran's knowledge that Dr. Tuteur resides here, Crosley-Corcoran reasonably could have expected to be haled into court in Massachusetts.

Indeed the facts at bar are similar to *Dudnikov v. Chalk & Vermilon Fine Arts, Inc,* 514 F.3d 1063 (10th Cir. 2008). In *Dudnikov*, the Colorado plaintiffs were "power sellers" of products on eBay. *Id*. The defendants, a British company and its Connecticut agent, claimed that some of plaintiffs' products violated their copyright. *Id*. They invoked eBay's Verified Rights Owners program, which mirrors the DMCA takedown procedure. *Id*. The defendants sent a notice of claimed infringement to eBay in California, resulting in the cancelation of plaintiffs' Internet auction. *Id*. In response, plaintiffs filed a counter notification based on fair use and ultimately filed a lawsuit in Colorado seeking a declaratory judgment that their prints were non-infringing. *Id*. Defendants contested jurisdiction on the basis that their infringement notice and threat to sue could not serve as the basis for personal jurisdiction in Colorado. *Id*. Influenced by the plaintiff's allegations that the defendants' position was "simply a smoke-screen attempt to justify unwarranted interference in the lawful sale of an item," the Tenth Circuit found personal jurisdiction based on "intentional and wrongful" conduct, including the "intentional action of sending a [takedown notice] specifically designed to terminate plaintiffs' auction…." *Id.* at 1073-1074; *see also*, *Doe v. Geller,* 533 F. Supp. 2d 996, 1001-05 (N.D. Cal. 2008) (declining to find personal jurisdiction in California over British defendants in suit for fraudulent DMCA takedown notices reasoning that *plaintiff's injuries from fraudulent takedown notices were more likely suffered in Pennsylvania where plaintiff lived*).

As in *Dudnikov,* Crosley-Corcoran's takedown notice "went well beyond providing notice to plaintiffs of the claimed infringement and seeking settlement." *Id.* at 1082. The facts reveal that these notices were similarly "smoke screens" designed to interfere with Dr. Tuteur's

ability to publish content on her website.  *Id.*  Indeed, the fact that Crosley-Corcoran never availed herself of her right under the DMCA to actually *bring* suit against Dr. Tuteur on the basis of the alleged infringement is further evidence of her knowledge and intent to misuse the DMCA's takedown provisions.  *See Online Policy Group v. Diebold, Inc*., 337 F.Supp. 2d 1195, 1204-5 (N.D. Cal. 2004) ("The fact that [defendant] never actually brought suit against any alleged infringer suggests strongly that defendant sought to use the DMCA's safe harbor provisions – which were designed to protect ISPs, not copyright holders – as a sword to suppress publication rather than a shield to protect its intellectual authority.").

In this regard, Defendant's analysis of the impact of cease-and-desist letters is largely inapposite.  *See Def's Memo*., pp. 10-13.  Although Crosley-Corcoran's cease-and-desist letter further augments her contacts with this forum, it is her takedown notices, combined with her overall scheme to interfere with Dr. Tuteur's ability to publish content on the Internet, on which this action is based.  In this regard, cease-and-desist letters share little in common with DMCA takedown notices, the impacts of which are immediate, automatic, and harmful.  Thus, Crosley-Corcoran's argument – aimed at proving that cease-and-desist letters, without more, cannot establish minimum contacts – simply misses the larger point.[10]  *See id*.

### 3.    In Light of Crosley-Corcoran's Targeted Campaign It Is Reasonable and Fundamentally Fair for This Court To Exercise Jurisdiction.

---

[10] That said, Defendant's cease-and-desist letter, along with conversations with Dr. Tuteur's Massachusetts attorney, bolster the additional contacts set forth above.  *See, e.g.*, *Hahn v. Vermont Law School*, 698 F.2d 48 (1st Cir. 1983) (finding two mailings from a non-resident defendant to a Massachusetts resident sufficient minimum contacts for personal jurisdiction); *Landmark Bank v. Machera*, 736 F. Supp. 375 (D. Mass. 1990) (holding due process satisfied by exercising jurisdiction over a defendant which had merely directed two letters and a telephone call into Massachusetts that related to an allegedly fraudulent investment scheme); *Bounty-Full Entertainment, Inc. v. Forever Blue Entertainment Group*, 923 F.Supp. 950, 956 (S.D. Tex. 1996) (cease-and-desist letter alone established jurisdiction).

Borrowing from *Burger King Corp. v. Rudzewicz*, *supra*, 471 U.S. at 476, the First Circuit has identified five Gestalt factors: (1) the defendant's burden of appearing; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the judicial system's interest in obtaining the most effective resolution of the controversy; and (5) the common interest of all sovereigns in promoting substantive social justice. *See United Electrical Workers v. 163 Pleasant St.,* 960 F.2d 1080, 1088 (1st Cir. 1992). These factors are designed to address the reasonableness and fundamental fairness of exercising jurisdiction over a particular defendant. *Pritzker v. Bob Yari*, 42 F.3d 53, 63 (1st Cir. 1994).

At this phase of the analysis, it is *Defendant's* burden to show unreasonableness and to do so she must make out a "compelling case." *See Burger King Corp.,* 471 U.S. at 477; *see also*, *The Campbell Pet Company v. Theresa Miale,* 542 F.3d at 885 (this factor "is to be applied sparingly"). Far from making a "compelling case," Defendant's Memorandum utterly fails to address the reasonableness prong of the due process analysis. *See Def's Memo.*, pp. 9-13. Consequently, Crosley-Corcoran has not met her burden of showing unreasonableness.

Nor should this Court assume that Crosley-Corcoran's burden of appearing is too great simply because she is a resident of another state. Tellingly, although Crosley-Corcoran contends – despite evidence to the contrary – that she was unaware that Dr. Tuteur lived in Massachusetts, she claims that she believed that "[Dr.] Tuteur was herself located in Utah, based on the location of her hosting provider." *See* Crosley-Corcoran Aff., p. 20. Thus, even assuming, *arguendo*, the truth of this statement, Crosley-Corcoran certainly knew that the injury she intended was directed at a party in another forum, far from her home state of Illinois. In this regard, the burden of appearing in Massachusetts is no greater than the burden of appearing in Utah.

The second "Gestalt factor," the forum state's interest in resolving the controversy, favors

19

exercising jurisdiction in the Commonwealth. Massachusetts has a "manifest interest" in protecting residents of this state from tortious conduct, and providing a convenient forum for redress of such injuries. *See Burger King*, 471 U.S. at 473; *Nowak*, 899 F. Supp. at 34. The state's interest in obtaining effective resolution of allegations of fraud in Massachusetts is compelling. *Id*. Dr. Tuteur's interest in obtaining relief in Massachusetts is strong, and her choice of forum is entitled to deference particularly where, as here, Defendant has failed to meet her burden to make a compelling case that personal jurisdiction in this court is unreasonable.[11]

## CONCLUSION

For the foregoing reasons, jurisdiction of this Court is proper, reasonable, and fair. Accordingly, Plaintiff Amy Tuteur, M.D., respectfully requests that this Court DENY Defendant's Motion to Dismiss for Lack of Personal Jurisdiction or, in the alternative, ALLOW Plaintiff's Cross-Motion for Limited Jurisdictional Discovery.

---

[11] Although the Complaint was pled on the basis of specific personal jurisdiction, it is likely that Crosley-Corcoran's business through the Feminist Breeder makes her subject to general jurisdiction in Massachusetts as well. While existence of a passive website is generally insufficient for purposes of conveying general jurisdiction, The Feminist Breeder is not a passive site; the site is interactive and offers a variety of products and services — some, upon information and belief, to Massachusetts residents. If this Court is disinclined to find personal jurisdiction under the present facts, Dr. Tuteur respectfully requests that she be permitted to take limited jurisdictional discovery of, *inter alia*, the extent of Defendant's contacts with Massachusetts in this regard. *See, e.g., Northern Light Technology v. Northern Lights Club*, 97 F. Supp. 2d 96 (D. Mass. 2000), aff'd, 236 F.3d 57 (1st Cir. 2001) (holding that defendant web-site operator had expressed an intention to do business in Massachusetts through general soliciting of advertisers and others through the site, its actual knowledge that the site was entering Massachusetts, and its direct solicitation of business dealings with the Massachusetts plaintiff on two occasions); *Venture Tape Corp. v. McGills Glass Warehouse*, 292 F. Supp. 2d 230, 232 (D. Mass. 2003); *Abiomed, Inc. v. Turnbull*, 379 F. Supp. 2d 90 (D. Mass. 2005) ("[T]he defendant intentionally directed his [web] postings toward Abiomed, a Massachusetts company and to an audience of Massachusetts residents and, given the unflattering nature of the postings, it can be inferred that Turnbull intended harm to be felt in Massachusetts therefore, haling of the defendant into a Massachusetts court to answer for his actions was foreseeable, if not inevitable."); *Gather, Inc. v. Gatheroo*, LLC, 443 F. Supp. 2d 108, 116 (D. Mass. 2006).