UNITED STATES DISTRICT COURT
FOR THE DISTRICT COURT OF MASSACHUSETTS

|  |  |
|---|---|
| AMY TUTEUR, M.D., <br><br> Plaintiff, <br><br> v. <br><br> GINA CROSLEY-CORCORAN, <br><br> Defendant. | Civil Action No.: 13-cv-10159-RGS |

**PLAINTIFF'S MEMORANDUM OF LAW TO SHOW CAUSE WHY
THE COMPLAINT SHOULD NOT BE DISMISSED ON THE MERITS
OR ON JURISDICTIONAL GROUNDS**

In response to this Court's April 10, 2013, Memorandum and Order on Defendant's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2) (Dkt. # 30) (the "Order"), Plaintiff Amy Tuteur, M.D. ("Dr. Tuteur"), submits this Memorandum to Show Cause why her Complaint should not be dismissed on the merits or on jurisdictional grounds.

## INTRODUCTION AND FACTUAL BACKGROUND

This case is not about a single DMCA takedown notice. Nor is it simply about Defendant's two takedown notices. Nor is about takedown notices that were sent in good faith, or even takedown notices sent negligently. It's not even about takedown notices designed to prevent copyright infringement at all. Indeed, it has little to do with a photograph of Defendant "making a graphic gesture with her middle finger that is often associated with an unrealized ambition of French soldiers at the Battle of Agincourt." Order, at 1. And, it has nothing to do with a purported good faith belief that Defendant's photograph was being infringed.

Rather, it is about a last-ditch effort by Dr. Tuteur to defend herself against Defendant's month-long, persistent and escalating course of conduct designed to unlawfully chase Dr. Tuteur off the Internet. It is about the only viable means of a victim to protect herself from an

1

individual who embarked on a crusade for the express purpose of squelching her speech simply because Defendant did not like the message or how it was expressed.

Defendant knew what she was doing. She knew that Dr. Tuteur's use of the photograph was authorized. She knew that she could not prevail in a copyright action. But, she also calculated that, despite having no viable copyright claim, she could nevertheless pretextually rely on the DMCA to stifle Dr. Tuteur's criticism of her. And, she knew that her conduct would harm Dr. Tuteur in Massachusetts.

The incontrovertible facts belie any suggestion to the contrary:

- February 5, 2011: Defendant asked where Dr. Tuteur lived and was informed that Dr. Tuteur resided in Massachusetts. Opp. to Motion to Dismiss, Exh. B (Dkt. # 26).

- December 13, 2012: Defendant posted the photograph on her blog, after which Dr. Tuteur posted it with commentary on her own blog. Order, at 2.

- December 16: Defendant's attorney sent a cease and desist letter threatening exorbitant statutory damages if Dr. Tuteur did not remove the photograph from her blog and pay Defendant some money. Compl., Exh. D (Dkt. # 1).

- December 16: Dr. Tuteur's attorney (and husband) put Defendant on notice that Dr. Tuteur's use of the photograph was authorized by Defendant and as a fair use, and warned that pursuit of Defendant's frivolous claim would be met with a request for sanctions. Compl., Exh. E.

- December 16 to December 20 (exact date unspecified): Defendant's new attorney located Dr. Tuteur's attorney-husband in Boston. Marcus Aff., ¶¶ 6-7 (Dkt. # 13).

- December 17: Defendant sent her *first* takedown notice (to Bluehost.com), forcing the removal of the photograph from Dr. Tuteur's blog. Compl., Exh. F (the "First Takedown Notice").

- December 20: Defendant's attorney, among other things, threatened copyright litigation, but focused on resolving "the larger issue of continued conflict between the two women and their respective substantial fan bases." Marcus Aff., Exh. A.

- December 22: Dr. Tuteur sent a counter notice reiterating her entitlement to use the photograph, *identifying her Massachusetts residence*, and triggering a 10-14 business day window for Defendant to sue for copyright infringement. Compl., Exh. G. (Counter notices are promptly forwarded to the sender of the takedown notice under 17 U.S.C. § 512(g)(2)(B).)

2

- December 23 to January 10:  Defendant's attorney exchanged correspondence with Dr. Tuteur's attorney in Boston and communicated with him by telephone.  Compl., ¶¶ 41-42; Marcus Aff., ¶¶ 7-10 & Exhs. A-C.

- January 10:  Defendant's attorney admitted that Defendant did not have a viable copyright claim.  Compl., ¶ 42.

- January 18:  Defendant acknowledged that her goal was to have Dr. Tuteur "stop personally attacking me . . . stop badgering me . . . ."  Compl., Exh. H.

- January 18:  Defendant recruited readers of her blog to identify possible copyright claims so *additional* takedown notices could be sent, and asked her readers for contributions to help finance her plan.  Compl., ¶ 45 & Exh. E.

- January 21:  Defendant boasted, "Bowing to pressure, 'Dr.' Amy moved her website to a different host yesterday.  :)"  Compl., ¶ 54.

- January 21:  Defendant sent a *second* takedown notice, this time to Dr. Tuteur's new blog host, DaringHost, *see* Compl., Exh. I (the "Second Takedown Notice"); and acknowledged in writing that she had Dr. Tuteur's home address.  Tuteur Aff., Exh. D (Dkt. # 27).

- January 22:  Defendant "move[d] things into place" with the stated intention that Dr. Tuteur's "brain is going to EXPLODE when she sees what I'm up to."  Compl., ¶¶ 55-56.

- January 22:  Dr. Tuteur's blog began suffering periodic outages.  Compl., ¶ 57.

- January 23:  Defendant (1) announced to her readership that Dr. Tuteur's blog was suspended; (2) reiterated her goal that "no host in their right mind is going to keep her hateful content on their servers"; and (3) bragged that "if [Dr. Tuteur] keeps doing what she's doing [*i.e.*, 'attacking me'], this will keep happening."  Compl., ¶¶ 58-60.

- January 24:  Dr. Tuteur was again forced to change hosts.  Compl., ¶ 61.

- January 25:  Dr. Tuteur commenced this action to protect herself from the continued reprisals from an overly-aggressive critic seeking to stifle her right of free speech.  Compl., ¶ 5.

This case transcends the parties.  It transcends the parties' polemic.  It involves the delicate balance between copyright law and the First Amendment.  It involves whether a copyright holder can by operation of law prevent the fair use of the copyright and stifle other speech with which the copyright holder disagrees.

3

Defendant is not an innocent copyright owner seeking to terminate copyright infringement. There was no infringement. Defendant knew this. But Defendant wanted to stifle Dr. Tuteur's criticism of her. Accordingly, she unlawfully resorted to the DMCA to chase Dr. Tuteur off the Internet, despite knowing that she had no good faith basis for claiming that Dr. Tuteur was not authorized (by Defendant's invitation or by law) to use the photograph. Indeed, Defendant's lawyer all but admitted as much, and this Court has since observed that Dr. "Tuteur would have a plausible, and even dispositive fair use defense or . . . a defense of implied license." Order at 5 (citations omitted).

If fair use and license can be ignored when filing a DMCA takedown notice, persons like the Defendant (and, indeed, far more powerful organizations), would have a safe haven to freely muzzle their critics by literally chasing them off the Internet. A victim – who did nothing unlawful *and whose acts were authorized by the Copyright Act* – would be left without recourse and without a voice.

As demonstrated below, however – and contrary to this Court's suggestion in its Order to Show Cause – the law *does* require that the sender of a takedown notice consider fair use and license. As a consequence, Defendant's *two* takedown notices, which both ignored fair use and were made in bad faith – violated the DMCA. Further, because Defendant knew that Dr. Tuteur was located in Massachusetts *before* she sent the cease and desist letter, *before* she issued the two takedown notices, and *before* she recruited others to join her crusade, this Court has personal jurisdiction over her and her actions.

## **ARGUMENT**

I. DR. TUTEUR HAS STATED A CLAIM UNDER SECTION 512(F) OF THE DMCA

In order to properly plead a claim under Section 512(f) of the Digital Millennium

4

Copyright Act, a plaintiff must allege that: (a) the defendant, in delivering a notice pursuant to Section 512, represented that certain online material infringed its copyright; (b) the defendant's representation was inaccurate (*e.g.*, the material was actually non-infringing); (c) the misrepresentation was material; and (d) the misrepresentation was made knowingly. 17 U.S.C. § 512(f); *see also generally ALS Scan, Inc. v. RemarQ Cmtys.*, 239 F.3d 619, 625 (4th Cir. 2001) ("To the extent that ALS Scan's claims about infringing materials prove to be false, RemarQ has remedies for any injury it suffers as a result of removing or disabling non-infringing material. *See* 17 U.S.C. § 512(f), (g)."). Dr. Tuteur has alleged each of these elements, along with ample facts to support her claim.[1]

---

[1] The Court's suggestion that Dr. Tuteur's lawsuit is preemptive (Order, p. 2) implies that Dr. Tuteur should have waited for Defendant to file a copyright infringement action, and asserted her Section 512(f) claim as a counterclaim. Such a conclusion contradicts the purpose and structure of Section 512, which was enacted by Congress to allow for rapid responses to potential claims of copyright infringement. 17 U.S.C. § 512(c) (describing takedown procedures), (g) (describing procedures for reinstating material contingent on copyright owner's response to counter notice), and (h) (authorizing pre-litigation subpoenas to identify users who posted allegedly infringing material). Thus, Section 512 was meant as an alternative or, in some instances, a precursor to a possible infringement lawsuit, not an antecedent. If Section 512(f) liability were only available after an infringement action, there would be no point to the Section 512 process.

As a related matter, Section 512(f) imposes liability for "any damages." Dr. Tuteur has alleged that Defendant's conduct damaged her "substantially and irreparably" and that "[s]uch injury includes, but is not limited to, the financial and personal expenses associated with responding to the claim of infringement and harm to her free speech rights under the First Amendment." Compl., ¶ 70. For example, Defendant's delivery of the two takedown notices prompted service interruptions to *The Skeptical OB*, thereby causing a temporary loss of readership and chilling her First Amendment-based right free expression. With respect to this latter point, the loss of First Amendment freedoms, for even minimal periods of time, constitutes harm. *See New York Times Co. v. United States*, 403 U.S. 713 (1971) (any loss of First Amendment rights can cause irreparable injury). While Defendant is not a state actor (and therefore Dr. Tuteur is not asserting that she has an independent cause of action for violation of her First Amendment rights), Dr. Tuteur does have a constitutionally-protected right of free speech. Defendant squelched Dr. Tuteur's speech and that harmed her. Finally, Section 512(f) explicitly notes that attorneys' fees and costs are to be included in the damage calculation. This language comports with the policy of Section 512(f): To protect the growth of the Internet as a vibrant public sphere by encouraging targets of DMCA abuse to vindicate their free speech rights. *See* S. Rep. No. 105-190 at 21, 59. Dr. Tuteur has incurred and continues to incur just this sort of damage, and deserves compensation for it.

A.     DEFENDANT DELIVERED TWO NOTICES UNDER SECTION 512(F) THROUGH WHICH SHE REPRESENTED THAT CERTAIN ONLINE MATERIAL INFRINGED HER COPYRIGHT

There appears to be no dispute that the Defendant's two takedown notices[2] were sent under Section 512 of the DMCA, or that in them, Defendant represented that Dr. Tuteur's use of the photograph infringed Defendant's copyright. Indeed, there could be none. For example, Defendant asserted within the body of the Notices themselves that they were being sent pursuant to Section 512(c) of the DMCA, and she concedes the same in her Affidavit. Compl., Exhs. F & I; Crosley-Corcoran Aff., ¶ 18 & 24 (Dkt. # 13); *see also* Order, p. 5. Accordingly, the first element of Dr. Tuteur's Section 512(f) claim is satisfied with respect to both takedown notices.

B.     DEFENDANT'S REPRESENTATIONS OF INFRINGEMENT WERE INACCURATE

The second element of the claim is whether the notice-giver's representations were inaccurate. The Court appears primarily to take issue with whether Dr. Tuteur can, as a matter of law, satisfy this element of the claim. Specifically, the Court states:

> But there is no requirement in the DMCA that a notice-giver inform the service provider of an infringer's possible affirmative defenses, only that she affirm her good faith belief (as appears to be the case here) that the copyrighted material is being used without her (or her agent's) permission. Seen in this light, there is no material misrepresentation by Crosley-Corcoran of infringement, as a viable cause of action under section 512(f)(1) would require.

Order, at 5-6.[3]

While a DMCA notice-giver need not "inform the service provider of an infringer's

---

[2] Throughout the Order, the Court appears to suggest that Defendant sent a single DMCA takedown notice to Dr. Tuteur. This is simply not the case. As the Complaint makes clear, Defendant sent two separate takedown notices to each of Bluehost.com and DaringHost (several weeks apart), and then exhorted her followers to either send takedown notices of their own, or fill out a form (which Defendant posted on her site) so that Defendant could submit takedown notices as their representative. *See* Compl., ¶ 45 & Exhs. D-F.

[3] Section 512(f)(1) establishes the claim for a DMCA takedown notice in which a defendant has made a misrepresentation "that material or activity is infringing . . . ."

possible affirmative defenses," the *threshold* question is whether, given the existence of an affirmative fair use (or license) defense, the notice-giver may issue a takedown notice at all. As demonstrated below, while this is an issue of first impression in this Circuit, the DMCA and established copyright law collectively make clear that when there is fair use (or permission), the notice-giver may *not* issue a takedown notice, as there is then no infringement.[4]

        1.      F<small>AIR</small> U<small>SE</small> M<small>UST</small> B<small>E</small> C<small>ONSIDERED</small>

           a.      F<small>AIR</small> U<small>SE</small> I<small>S</small> N<small>OT</small> I<small>NFRINGEMENT</small>

Section 107 of the Copyright Act is unambiguous: "Notwithstanding the provisions of section 106 and 106A, *the fair use of a copyrighted work . . . is not an infringement of copyright*." (Emphasis added.) Pursuant to the plain language of the Copyright Act, then, a fair use is not infringing.

The United States Supreme Court explained:

> [T]he definition of exclusive rights in § 106 of the present Act is prefaced by the words "subject to sections 107 through 118." *Those sections describe a variety of uses of copyrighted material that "are not infringements of copyright notwithstanding the provisions of § 106."* The most pertinent in this case is § 107, the legislative endorsement of the doctrine of 'fair use.'

*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 447 (1984) (emphasis added).

Because a fair use is never a violation of the rights identified in Section 106, a fair use is

---

[4] Given the dearth of case law in this Circuit, as well as the novelty of the claims and issues, this action "should be resolved only after the parties have been given an opportunity to develop the facts and marshal their arguments," because "'[t]he court should be especially reluctant to dismiss on the basis of the pleadings when the asserted theory of liability is novel or extreme, since it is important that new legal theories be explored and assayed in the light of actual facts rather than a pleader's suppositions.'" *Bldg. Officials & Code Adm. Int'l, Inc. v. Code Tech., Inc.*, 1980 WL 1169, *3 (D. Mass. Oct. 27, 1980) (Mazzone, J.), quoting 5 Wright & Miller, § 1357, at 603 (1969). This is especially true for copyright cases. *See id.* Indeed, the leading Section 512(f) cases decided the issue of knowledge on summary judgment, *after* the parties had an opportunity to develop their evidence. *See, e.g., Rossi v. MPAA*, 391 F.3d 1000 (9th Cir. 2004); *Online Policy Group v. Diebold*, 337 F.Supp.2d 1195 (N.D. Cal. 2004); *UMG v. Augusto*, 2008 WL 2390037 (C.D. Cal., June 10, 2008).

a non-infringing use, whether or not the user is herself sued and raises fair use as a defense.[5] Indeed, the Supreme Court makes this point clearly: "Anyone . . . who makes a fair use of the work *is not an infringer of the copyright* with respect to such use." *Id.* (emphasis added); *see also Penelope v. Brown*, 792 F. Supp. 132, 136 (D. Mass. 1992) ("The fair use of a copyrighted work is not an infringement of copyright."); *Online Policy Group v. Diebold*, 337 F. Supp. 2d 1195, 1200 (N.D. Cal. 2004) ("a fair use is not infringement of a copyright") (citations omitted); *Assoc. of Am. Med. Colls. v. Cuomo*, 928 F.2d 519, 523 (2d Cir. 1991) ("[i]t has long been recognized that certain unauthorized but 'fair' uses of copyrighted material do not constitute copyright infringement").

      b.      A DMCA NOTICE-GIVER MUST CONSIDER FAIR USE PRIOR TO SENDING A TAKEDOWN NOTICE

Because fair use is not infringement, a takedown notice-giver's assertion that the challenged use was infringing necessarily embodies a corollary representation that there was no fair use. The Court summarily dismissed this point by stating that fair use is an "affirmative defense." Order, p. 5. An affirmative defense is, however, simply a procedural vehicle. It does not alter the requirement that a copyright owner consider fair use when making a representation that a use is infringing.

This is precisely the conclusion reached in the leading DMCA takedown case, *Lenz v. Universal Music Corp.*, 572 F. Supp. 2d 1150 (N.D. Cal. 2008). Analyzing this very issue, the court denied defendants' motion to dismiss plaintiff's Section 512(f) misrepresentation claim and held:

---

[5] As an analogy, in many states, truth is an affirmative defense to defamation. *Masson v. New Yorker*, 501 U.S. 496 (1991). Nonetheless, if a statement is truthful, that statement is not defamatory, whether or not the truth of the statement is raised as an affirmative defense, because a true statement cannot be defamatory. Similarly, a fair use cannot be an infringing use.

8

> The DMCA already requires copyright owners to make an initial review of the potentially infringing material prior to sending a takedown notice; indeed, it would be impossible to meet any of the requirements of Section 512(c) without doing so. *A consideration of the applicability of the fair use doctrine simply is part of that initial review*.

*Id*. at 1155 (emphasis added). *See also Diebold*, 337 F. Supp. 2d at 1200 & 1206 (concluding that the plaintiff's publication of certain emails constituted fair use, the court held that defendant had violated the DMCA takedown notice provisions).

To hold otherwise would drastically undermine the two goals set forth by Congress in the DMCA's legislative history; namely, (a) to protect end users posting non-infringing material from frivolous takedowns and (b) to deter abuse of the DMCA notice process. *See* S. Rep. No. 105-190 at 21 (1998) (Section 512 was intended to "balance the need for rapid response to potential infringement *with the end-user's legitimate interests in not having material removed without recourse*.") (emphasis added); *see also id.* at 59 (Section 512(f) "is intended to deter knowingly false allegations to service providers in recognition that such misrepresentations are detrimental to rights holders, service providers, and *Internet users*.") (emphasis added).

Contrary to these dual objectives, the Court's interpretation of Section 512 would immunize a copyright owner's claim of infringement – no matter how frivolous – from review or redress under Section 512(f). A copyright owner would simply need to recite, among the other required takedown notice contents, that she owns the copyright and that she believes in good faith that the copyrighted material is being used without permission. But if that were the case, the language in Section 512(c)(3)(A)(v) requiring a representation that the "use of the material in the manner complained of is not authorized by . . . the law," would be meaningless.[6] *See United*

---

[6] Although Defendant adhered to the other required contents of a DMCA notice (including even broadly representing that there was infringement and that neither she nor her agent authorized it), she conspicuously omitted expressly representing that the use not be authorized *by law*. Compl., Exh. I. As

9

*States v. Ven–Fuel, Inc.*, 758 F.2d 741, 751–52 (1st Cir.1985) (explaining that "[a]ll words and provisions of statutes are intended to have meaning and are to be given effect, and no construction should be adopted which would render statutory words or phrases meaningless, redundant, or superfluous.").

Accordingly, a representation of infringement in a DMCA takedown notice must include an underlying representation that the purported infringer's use is not a fair use.

In this regard, the express and implied representations of a takedown notice are broader than the Court's focus on the Defendant's representation that the photograph was "published by Tuteur without permission."[7]  Order, at 5.  Defendant's representation that the publication was unauthorized is only a portion of what is required by the DMCA.  Section 512(c)(3)(A) of the DMCA broadly requires a takedown notice to contain "[a] statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, *or the law*."  17 U.S.C. § 512(c)(3)(A)(v) (emphasis added). In an apparent effort to satisfy that mandate, Defendant affirmed broadly in both takedown notices that Dr. Tuteur had infringed her copyright. (*E.g.*, "This letter is a Notice of Infringement as authorized in § 512(c) of the U.S. Copyright Law." Complaint, Exhs. F & I.)  Thus, the affirmation upon which the Court focused (*i.e.*, that the photograph was used without permission) is only a portion of Defendant's representations, and does not consider Defendant's

---

discussed below, Defendant's studious avoidance of that express representation suggests her consciousness that the representation was not made in good faith.

[7] It bears mention that, as the Court observed, Defendant may also have given Dr. Tuteur a license (express or implied) to use Defendant's photograph.  Order at 5 (citing *Estate of Hevia v. Portrio Corp.*, 602 F.3d 34, 40-42 (1st Cir. 2010)).  Because the license would have constituted permission – *i.e.*, authorization – Defendant's representations in the two takedown notices that she had not given permission were false.

mandatory blanket representation of infringement.[8]

### 2. DR. TUTEUR'S USE OF THE PHOTOGRAPH WAS A FAIR USE

Given that fair use must be considered, the question then becomes whether Dr. Tuteur's use of the photograph was a fair use. It was.

Fair use is an equitable doctrine that grants others the privilege "to use copyrighted material in a reasonable manner without [the owner's] consent." *Haberman v. Hustler Magazine*, 626 F. Supp. 201, 207 (D. Mass. 1986) (quoting *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562 (1985) (citation omitted). Pursuant to the Copyright Act:

> In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107; *see generally Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577-78 (1994).

With respect to the first factor, the purpose and character of the use, Dr. Tuteur's use of the photograph was transformative because the work was used "in conjunction with editorial commentary." *Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 23 (1st Cir. 2000).

---

[8] To be clear, this element is separable from the question of whether defendant had knowledge of the fair use (or license). In *Rossi v. MPAA*, 391 F.3d 1000, 1003 (9th Cir. 2004), for example, there was no question that the defendant in that case had made a mistake, *i.e.*, had misrepresented that the plaintiff's site was infringing; the only question was whether the defendant could have formed a subjective good faith belief to the contrary. Whether, as a factual matter, Crosley-Corcoran actually had a good faith basis for her belief that there was infringement is addressed in subsection D below.

Specifically, as Dr. Tuteur's counsel informed Defendant on December 16, 2012, Dr. Tuteur used the photograph in connection with a blog post questioning the maturity, wisdom and education of so-called "birth activists" (like Ms. Crosley-Corcoran) who profess to know more about labor and delivery than obstetricians and fully-trained, certified nurse midwives.  Compl., Exh. E; *see also* Compl., ¶¶ 26, 27 & Exh. C.  In so doing, Dr. Tuteur used the photograph "for 'a further purpose,' giving [it] a new 'meaning, or message.'"  *Nunez*, 235 F.3d at 23, quoting *Campbell*, 510 U.S. at 579.  A transformative work "is the very type of activity that the fair use doctrine intends to protect for the enrichment of society."  *Castle Rock Ent. v. Carol Pub. Group, Inc.*, 150 F.3d 132, 142 (2d Cir. 1998).  In this regard, Dr. Tuteur's transformative use of the photograph weighs heavily in favor of fair use.  Indeed, "[t]he more 'transformative' the new work, the less the significance of factors that weigh against fair use. . . ."  *Nunez*, 235 F.3d at 22.

The fact that *The Skeptical OB* has a commercial component does not weigh against a finding that Dr. Tuteur's use of the photograph was fair use.  *See Haberman*, 626 F. Supp. at 210 ("Commentary 'is not put to a commercial use simply because the publication is sold rather than given to the public.'"  Quoting *Pillsbury Co. v. Milky Way Prods., Inc.*, 215 U.S.P.Q. 124, 131 (N.D. Ga. 1981)).  In order "[f]or a commercial use to weigh heavily against a finding of fair use, it must involve more than simply publication in a profit-making venture."  *Nunez*, 235 F.3d at 22.  In this case, the photograph was reproduced within the body of an article, and not used "to create an enticing lead page that would prompt readers" to flock to *The Skeptical OB*.  *Id.*; *see Haberman*, 626 F. Supp. at 210.  Accordingly, *The Skeptical OB*'s commercial nature (inherent to any news outlet), does not weigh against fair use.

With respect to the second factor, the nature of the original work, although Ms. Crosley-Corcoran will likely contend that the photograph is creative, as opposed to factual, this factor

12

tends to carry the least weight in the fair use analysis. Where, as here, the use is transformative, the nature of the work is "not . . . terribly significant in the overall fair use balancing." *Mattel Inc. v. Walking Mountains Prods.*, 353 F.3d 792, 803 (9th Cir. 2003) (finding fair use of the Barbie doll, a clearly creative work, when the incorporation of the original work is necessary for the secondary use).

With respect to the third factor (*i.e.*, the amount and substantiality of the use), while *The Skeptical OB* displayed the entire photograph, it did not include most of the associated text, nor was the display of the photograph excessive. For purposes of evaluating this element, "context is everything," and "[c]opying does not become excessive . . . merely because the portion taken was the original's heart." *Campbell*, 510 U.S. at 588-89. As Campbell instructs, "the question of fairness asks what else the [alleged infringer] did besides go to the heart of the original." *Id.* In this case, Dr. Tuteur displayed the necessary elements of the photograph sufficient to tie her commentary to Defendant's implied message – namely, Defendant's face and her raised middle finger. Simply put, Dr. Tuteur "only copie[d] as much as is necessary for . . . her intended use," and, accordingly, this factor should not weigh against her. *See Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 820-21 (9th Cir. 2003).

Finally, with respect to the fourth factor (market harm), there is no conceivable basis that Dr. Tuteur's use would have any negative impact on Defendant's market for her work. To the contrary, shortly after the Complaint was filed, Defendant capitalized on the publicity surrounding this action by converting her website to a subscription-only model, requiring readers to pay a membership fee to access most of the content on her blog, known as "The Feminist Breeder."

Given the foregoing, Dr. Tuteur's use of the photograph was, as this Court observed,[9] a fair use. As a consequence, Defendant's representation that there was infringement was, in fact, a misrepresentation. Dr. Tuteur has thus established the second element of her claim for violation of Section 512(f) of the DMCA.

### C. DEFENDANT'S MISREPRESENTATION WAS MATERIAL

The third element is that Defendant's misrepresentation be material. In the context of a DMCA takedown notice, "'[m]aterial means that the misrepresentation affected the ISP's response to a DMCA letter." *See Diebold*, 337 F. Supp. 2d at 1204. Dr. Tuteur alleged, and Defendant does not appear to dispute, that Dr. Tuteur's web hosts (Bluehost.com and DaringHost) each removed the photographs (and, indeed, threatened termination of all service for Dr. Tuteur's website) in response to Ms. Crosley-Corcoran's Notices. Accordingly, the third element of Dr. Tuteur's Section 512(f) claim is also satisfied.

### D. DEFENDANT KNEW DR. TUTEUR'S USE WAS FAIR USE

The only real question, then, is whether Defendant had a good-faith belief, at the times she sent either or both of the two DMCA takedown notices, that Dr. Tuteur's use was infringing. Although the obvious fair-use nature of Dr. Tuteur's use (a conclusion buttressed by this Court's finding that "Tuteur would have a plausible, *and even dispositive fair use* affirmative defense") belies a claim of good faith, the Court need not reach that issue – and certainly should not reach it at this stage of the pleadings.

Before Defendant sent either of her two takedown notices: (1) Dr. Tuteur's counsel

---

[9] This Court's finding that "Tuteur would have a plausible, and even dispositive fair use affirmative defense" is consistent with other courts that have found (or rejected) fair use based solely on the pleadings. In *Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 21 (1st Cir. 2000), for example, the First Circuit affirmed a district court's dismissal of a complaint with prejudice when the dismissal was based on the conclusion that the use of a photograph was fair use.

explained to Defendant that Dr. Tuteur's use of the photograph was a fair use; and (2) Defendant consulted with her attorney, who later confirmed to Dr. Tuteur's counsel that Defendant had no claim for infringement. Thus, Defendant had actual knowledge that Dr. Tuteur's use constituted a fair use, which Defendant deliberately ignored.[10] Accordingly, Defendant failed to form a good faith belief as to the nature of Dr. Tuteur's use of the photograph or otherwise comply with her obligation to consider fair use. *See Lenz*, 572 F. Supp. 2d at 1155.

Even if the Court were to disregard actual notice to the Defendant, the result would be the same. In *Diebold*, for example, the defendants responded to the online publication of certain of their internal emails by sending DMCA takedown notices to the plaintiffs' Internet service providers ("ISPs"). 337 F. Supp. 2d at 1197-98. The plaintiffs asserted claims for misrepresentation under Section 512(f). *Id.* at 1198. The court concluded that the publication of the emails constituted fair use and, consequently, entered summary judgment in the plaintiffs' favor. *Id.*, at 1200 & 1206. In support of its ruling that the defendants' takedown notices violated Section 512(f), the court reasoned that:

> A party is liable if it "knowingly" and "materially" misrepresents that copyright infringement has occurred. "Knowingly" means that a party actually knew,

---

[10] The Court observes that "there would seem nothing improper about the purpose of Crosley-Corcoran's takedown notice, which was to stop what she believed was an infringement of her copyrighted likeness, while the means that she chose, sending a notice to the service provider, was one explicitly authorized by the statute." *Id.* However, Dr. Tuteur's allegation – based on Defendant's own words – is that her motive was not to remedy copyright infringement, but rather to stifle Dr. Tuteur's right to advocate a position on the Internet. Defendant expressly acknowledged that her true motive was to force Dr. Tuteur to "stop personally attacking me . . . stop badgering me . . . ." Complaint, Exh. H. Similarly, Defendant's attorney explained that the real issue was the "continued conflict between the two women and their respective substantial fan bases." Marcus, Exh. A. Accordingly, the tortious interference claim is based on both an improper ulterior motive and of using an otherwise lawful device (a DMCA takedown notice) for a purpose for which it is not intended. Indeed, in addition to also soliciting others to pursue Dr. Tuteur, Defendant appears to have engaged in other conduct (which would "EXPLODE" Dr. Tuteur's brain), which had the apparent effect of causing Dr. Tuteur's to suffer intermittent outages. Thus, to the extent that there is a factual issue concerning Defendant's improper motive or means, dismissal of the tortious interference claim would be inappropriate at this juncture.

should have known if it acted with reasonable care or diligence, or would have had no substantial doubt had it been acting in good faith, that it was making misrepresentations. *See* Black's Law Dictionary (8th ed.2004) (definitions of "knowledge," in particular, "actual" and "constructive" knowledge).

\*\*\*

No reasonable copyright holder could have believed that the portions of the email archive discussing possible technical problems with Diebold's voting machines were protected by copyright, and there is no genuine issue of fact that Diebold knew—and indeed that it specifically intended—that its [takedown] letters . . . would result in prevention of publication of that content. The misrepresentations were material in that they resulted in removal of the content from websites and the initiation of the present lawsuit. The fact that Diebold never actually brought suit against any alleged infringer suggests strongly that Diebold sought to use the DMCA's safe harbor provisions—which were designed to protect ISPs, not copyright holders—as a sword to suppress publication of embarrassing content rather than as a shield to protect its intellectual property.

*Id.*, at 1204-05.

As in *Diebold*, Defendant could not have reasonably believed that Dr. Tuteur's use of the photograph was infringing given the obvious nature of the fair use. Also, like the defendants in *Diebold*, it is self-evident that Defendant knew and intended that her two takedown notices would result in prevention of further publication of photograph. *See id.* In addition, also like the defendants in *Diebold*, despite weeks of alleged "copyright infringement" by Dr. Tuteur, Defendant never exercised her "rights" under 17 U.S.C. § 512 by filing suit.

Instructively, unlike the defendants in *Diebold*, Ms. Crosley-Corcoran can be further charged with *actual knowledge* that the use was fair use. In this respect, *Diebold*'s analysis of the intersection of good faith and knowledge comports with this Circuit's interpretation of what generally constitutes a "good faith" belief. *See, e.g., United States v. Anthony*, 545 F.3d 60, 65 (1st Cir. 2008) (reasoning that "the defense that the accused did not know of his duty fails if he came by his ignorance through deliberate avoidance of materials that would have apprised him of his duty, as such avoidance undermines the claim of good faith."). Accordingly, neither

Defendant's mere recitation of the Section 512(c)(3) elements of notification nor her affirmation of a good faith belief that the copyrighted material was being used without permission provides a basis for defending against a claim for misrepresentation under Section 512(f).

Indeed, Defendant's knowledge that she was unable to represent in good faith that Dr. Tuteur's use was not authorized by law, is further supported by her careful crafting of her DMCA notices.[11]  Specifically, Defendant omitted the phrase "or the law" from her otherwise-fastidious tracking of the takedown notice requirements.  Compl., Exhs. F & I.  Such a blatant omission suggests an attempt to evade the consequences of making a false, sworn statement that Dr. Tuteur's use of the photograph actually violated any law – especially when viewed in the context of both Defendant's constructive notice and actual notice that the use was a fair use.

II.     THIS COURT HAS PERSONAL JURISDICTION OVER DEFENDANT

In addition to the substantive issues concerning Defendant's misrepresentation, the Court has expressed doubts about whether it has personal jurisdiction over the Defendant:

> The so-called "effects" test derived from *Calder* provides that "a defendant's tortious acts can serve as a source of personal jurisdiction only where the plaintiff makes a prima facie showing that the defendant's acts (1) were intentional, (2) were uniquely or expressly aimed at the forum state, and (3) caused harm, the brunt of which was suffered - and which the defendant knew was likely to be suffered - [in the forum state]." *Johnson v. Arden*, 614 F.3d 785, 795-796 (8th Cir. 2010), quoting *Lindgren v. GDT, LLC*, 312 F. Supp. 2d 1125, 1132 (S.D. Iowa 2004).  It would seem unlikely that Tuteur could satisfy the three elements of the *Calder* test, particularly the second.

Order at 4, n.2.

There can be no doubt, however, that Defendant's acts were intentional.  That is

---

[11] Dr. Tuteur is not relying on an allegation that Defendant was negligent, whether mere negligence would be sufficient or not.  *See Cabell v. Zimmerman*, 2010 WL 996007 (S.D.N.Y. Mar. 12, 2010) (no misrepresentation under Section 512(f) where defendant was merely negligent in not assessing whether there was fair use).  Rather, here, Defendant's lack of good faith appears intentional, or, at a minimum, the result of willful blindness.

established above.  Similarly, the fact that Dr. Tuteur, a resident of Massachusetts, has been harmed in Massachusetts is addressed in pages 2-4 and footnote 1 above, as well as at pages 13-18 of Dr. Tuteur's opposition to Defendant's Motion to Dismiss.

Accordingly, the Court's concern seems to focus on whether Defendant knew that Dr. Tuteur was located in Massachusetts.  The facts elicited to this point so far, however, belie Defendant's professed ignorance of Dr. Tuteur's Massachusetts residence.  These include the following:

- On February 5, 2011 (more than a year before the Defendant sent her first DMCA takedown notice), Defendant asked where Dr. Tuteur lived and was informed that Dr. Tuteur resided in Massachusetts.  Opp. to Motion to Dismiss, Exh. B.

- Some time between December 16 to December 20, 2012 (*i.e.*, before the Second Takedown Notice, and possibly before the first), Defendant's new attorney located Dr. Tuteur's attorney-husband in Boston.  Marcus Aff., ¶¶ 6-7.

- On January 21, 2013 – the same day that Defendant sent her Second Takedown Notice – she acknowledged in writing that she had Dr. Tuteur's home address. Tuteur Aff., Exh. D.

Consistent with the foregoing, the publicly-available registration information for *The Skeptical OB* – upon which Defendant necessarily relied in locating the hosts for Dr. Tuteur's blog – listed Dr. Tuteur's home address.  *See* Tuteur Aff., ¶ 10; registration info from whois.net, Opposition to Motion to Dismiss, Exh. C; *see also*, 2013 Feminist Breeder Facebook post, *id.* Exh. D (demonstrating common knowledge that online users rely on whois.net for these purposes: "it is not hard to find her address…whois.net").

Thus, before embarking on her wrongful efforts to shut down Dr. Tuteur, Defendant knew that Dr. Tuteur resided in Massachusetts.  Accordingly, Defendant intended the effects of her conduct to be felt by Dr. Tuteur *in Massachusetts*.  And, as a result, Dr. Tuteur was forced to spend countless hours – in Massachusetts – attempting to maintain her website's presence – and

thereby her voice – on the Internet. Tuteur Aff., ¶ 12.

This is not a case where a defendant's mere negligence happened to cause harm in this forum; rather, this is a case where Ms. Crosley-Corcoran intentionally targeted Dr. Tuteur in Massachusetts, thereby satisfying the jurisdictional prerequisites. Consequently, it is fair and appropriate for this Court to exercise jurisdiction over Ms. Crosley-Corcoran.[12]

## CONCLUSION

For the reasons stated above, this Court should rule that there is good cause for Dr. Tuteur's action to proceed, as her claims are well-founded and properly pled, and because this Court has personal jurisdiction over Ms. Crosley-Corcoran.

Respectfully submitted,

*/s/ Stephen Riden*
Russell Beck (BBO # 561031)
  *rbeck@beckreed.com*
Stephen D. Riden (BBO # 644451)
  *sriden@beckreed.com*
BECK REED RIDEN LLP
155 Federal Street, Suite 1302
Boston, MA 02110
Telephone: (617) 500-8660
Facsimile: (617) 500-8665

Dated: May 1, 2013

---

[12] While the facts known to Dr. Tuteur to date are sufficient to establish this Court's personal jurisdiction over Defendant, if this Court determines that further jurisdictional evidence is necessary, Dr. Tuteur respectfully renews her request for limited jurisdictional discovery (Dkt. # 28). Indeed, in addition to discovery into the factual issues supporting this Court's specific jurisdiction over Defendant, the facts may turn out to support the exercise of general jurisdiction. In this regard, Defendant contends that her blog is read by "a few million people." *See* Opposition to Motion to Dismiss, Exh. A. The Feminist Breeder contains advertisements, press-kits, and an online store through which Defendant sells a wide variety of merchandise. *See id*. Upon information and belief, The Feminist Breeder has subscribers throughout the country, including within Massachusetts, some of whom actively participate in her blog and/or purchase merchandise from the online store. Tuteur Aff. ¶ 11.

## CERTIFICATE OF SERVICE

    I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified in the Notice of Electronic Filing and paper or electronic copies will be delivered to those indicated as non-registered participants on May 1, 2013.

                                            */s/ Stephen D. Riden*
                                            Stephen D. Riden