UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| AMY TUTEUR, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 13-cv-10159-RGS |
| | ) | |
| v. | ) | |
| | ) | **LEAVE TO FILE** |
| GINA CROSLEY-CORCORAN, | ) | **GRANTED ON** |
| | ) | **MAY 13, 2013** |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S RESPONSE TO PLAINTIFF'S
## MEMORANDUM OF LAW TO SHOW CAUSE

The Court had it right the first time.

In indicating its intention to dismiss Plaintiff Amy Tuteur's ("Tuteur") complaint for failure to state a claim upon which relief could be granted, the Court reached the right result, although for possibly more reasons than it knew at the time. Not only are Tuteur's claims precluded by the plain reading of the Digital Millennium Copyright Act ("DMCA") as indicated by this Court, but also because of Tuteur's: (a) failure to properly allege (and inability to so allege) required elements of her claim; (b) inability to meet certain legal tests as a matter of law; and (c) blatant misrepresentations going to crucial elements of her claim. Similarly, Tuteur's state law claim fails as a matter of law both because of an inability meet the elements of that claim, but also because of federal preemption. Accordingly, the Court's initial impressions were correct and the present case should be dismissed on the merits

## Procedural Background

On March 5, 2013, Defendant Gina Crosley-Corcoran ("Crosley-Corcoran") filed a Motion to Dismiss the present action for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2). On April 10, 2013, this Court exercised its discretion to address the underlying merits of the Plaintiff's claims, ordering the Plaintiff to Show Cause why her complaint should not be dismissed on the merits for failure to state a claim upon which relief may be granted (the "April 10 Order"). On May 1, 2013, in accordance with this Court's order, Plaintiff filed a memorandum of law, arguing that this Court has misinterpreted and incorrectly applied certain portions of the Digital Millennium Copyright Act ("DMCA").

Given this Court's familiarity with the facts of this case, as indicated in the April 10 Order, Crosley-Corcoran does not undertake to restate here facts already before the Court, but instead notes discrete additional facts as needed.

## ARGUMENT

I.      Not Only Has Tuteur Failed To Plead an Essential Element of Her §512(f) Claim, She Has Intentionally Misled This Court About The Basis of Her Claim.

The statute under which Tuteur has brought her DMCA claim, 17 U.S.C. § 512(f), provides that:

> Any person who knowingly materially misrepresents under this section… that material or activity is infringing… shall be liable for any damages… incurred by the alleged infringer… who is injured by such misrepresentation, as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing, or in replacing the removed material or ceasing to disable access to it.

Courts have held that the "unambiguous" meaning of this section is that an alleged infringer can *only* recover under § 512(f) if she suffered damages as a result of the service

provider "removing or disabling access to the material." *Amaretto Ranch Breedables, LLC v. Ozimals, Inc.*, 790 F. Supp. 2d 1024, 1029 (N.D. Cal. 2011).

In *Amaretto Ranch Breedables,* the plaintiff alleged that the defendants had sent knowingly false takedown notices to the plaintiff's service provider, Linden Research, Inc. A takedown was only avoided when the plaintiff sought and received a preliminary injunction prohibiting it. *Amaretto Ranch Breedables, LLC v. Ozimals, Inc.,* 2010 U.S. Dist. LEXIS 141242 (N.D. Cal. Dec. 21, 2010). Ultimately, however, the Court dismissed the plaintiff's Section 512 claims with prejudice because the "plain language of section 512[f] limit[s] damages to those caused by an actual takedown" and "no takedown occurred." 790 F. Supp. at 1029. *See also Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 704-05 (D. Md. 2011)(dismissing plaintiff's claims under § 512(f) where a takedown notice did not cause the webhosting provider to take down plaintiff's website); *Lenz v. Universal Music Corp.,* 2010 U.S. Dist. LEXIS 16899, *26 (N.D. Cal. Feb. 25, 2010) (dismissing plaintiff's § 512(f) claims because "a fair reading of the statute, the legislative history, and similar statutory language indicates that a § 512(f) plaintiff's damages must be proximately caused by the misrepresentation to the service provider and the service provider's reliance on the misrepresentation.")

In the present case, the Plaintiff does not directly allege that either of her two webhosts – BlueHost or Daring Host – actually took down her blog or even that they took down the photograph of Ms. Crosley-Corcora that the Plaintiff posted on her blog. Instead, Tuteur alleges that: (a) with respect to Tuteur's first host, BlueHost, Crosley-Corcoran submitted a takedown notice; (b) BlueHost informed Tuteur of the notice and warned her that her site *could be* taken down if the infringing materials were not removed; (c) Tuteur

temporarily removed the photograph from her site; (d) Tuteur filed a DMCA counter-notice with BlueHost;[1] (e) Tuteur subsequently put a cropped version of the photograph back on her site; and (f) Tuteur chose to move her website to a new host, Daring Host. Complaint ¶¶ 35-40, 43. Tuteur's failure to allege that BlueHost took down her site is not inadvertent. As Tuteur is well aware, once she sent BlueHost her counter-notice, **BlueHost told both parties that it would take no action**. *See* Exhibit 1 ("The copyright claim regarding this domain has a counter claim issued. If a counter claim is submitted, it will be up to the two parties to pursue legal action.")

Similarly, the Plaintiff alleges that, with respect to Daring Host: (a) Crosley-Corcoran sent a takedown notice; (b) Daring Host threatened a possible service interruption of the infringing photograph was not removed; and (c) Tuteur removed the photograph and filed a counter-notice. Complaint ¶¶46-51. Tuteur *does* allege that Daring Host informed her that it would no longer host her website and she alleges, "on information and belief" that Daring Host's "decision was based on the DMCA notices sent by Crosley-Corcoran and Crosley-Corcoran's planned interference with Dr. Amy's relationship with Daring Host." Complaint, ¶61. **Tuteur knew that this assertion was misleading (at best) at the time the Complaint was filed.**

To the contrary, Daring Host had told Tuteur that her site was receiving more traffic than the web host could support and that this was affecting the host's ability to serve its other clients. *See* Affidavit of Daring Host owner, Nick Esposito, attached hereto as

---

[1] Somewhat ironically, Tuteur's counter-notice to BlueHost *does* violate § 512(f) inasmuch as Tuteur not only claimed that she had a good faith belief that her use of the photograph was authorized, but she also swore "under penalty of perjury that the above information in this notification is accurate and that I am the owner or that I am authorized to act on the owner's behalf and that I have a good faith belief that the material was removed or disabled as a result of mistake or misidentification of the material to be removed or disabled." *See* Exhibit 2. Tuteur had no good faith subjective belief that she owned Crosley-Corcoran's photograph.

Exhibit 3. Indeed, before asking Tuteur to move her site to another provider, Daring Host worked with her to try to troubleshoot the technical issues and reduce the site's use of resources. *Id.* It was only when Daring Host was unable to resolve this purely technical issue that it asked Tuteur to move her site to another provider. *Id.* And, although Daring Host did have concerns about the escalating rhetoric between Tuteur and Crosley-Corcoran, the decision to ask Tuteur to move her website was unrelated to the DMCA takedown notices themselves. *Id.* Prior to the filing of this lawsuit, Tuteur's counsel contacted Mr. Esposito by telephone and Mr. Esposito specifically informed counsel of the reason for his request that Tuteur move her website to another hosting provider. *Id.* Despite being fully informed of the *real* reason for Daring Host's request, the Complaint nevertheless seeks to satisfy a pleading prerequisite of § 512 by alleging "on information and belief" a statement of a fact that at best lacks any good faith basis, and at worst is a knowing misstatement of fact.

Because neither BlueHost nor Daring Host removed or disabled access to any materials on the Plaintiff's site at all (and certainly not in response to Crosley-Corcoran's DMCA takedown notices), Count I of her Complaint must be dismissed as a matter of law.

II.     Dismissal of the Plaintiff's § 512(f) Claim is Also Proper Because Tuteur Cannot Meet The "High Bar" Of Disproving Subjective Good Faith.

Although there is much on which the parties disagree, certain dispositive facts are not in dispute. Prior to sending either of the two takedown notices at issue in this case, Crosley-Corcoran sought out and obtained the advice of two attorneys, Kim Bilbrey and Jake Marcus. *See,* Bilbrey Affidavit (docket entry 13-11); Marcus Affidavit (docket entry 13-7); Crosley-Corcoran Affidavit (docket entry 13-10). Indeed, far from disputing this fact, Tuteur trumpets it in her Complaint. *See* Complaint, ¶68 ("whether or not Defendant

Crosley-Corcoran personally has a sophisticated understanding of copyright law, she has been represented by at least two attorneys during the period when she issued the DMCA takedown notices and, therefore, should have known that Dr. Amy's use of the Finger Photograph did not infringe any copyrights.").

In her affidavit, Attorney Bilbrey (who only represented Crosley-Corcoran for a brief period at the start of this dispute), stated that she assisted Crosley-Corcoran in preparing a cease-and-desist letter which she prepared and sent to the Plaintiff, believing it to be fully proper and in good faith. Bilbrey Affidavit, ¶ 5. Crosley-Corcoran's second attorney, Jake Marcus, makes it clear in her email that she fully considered – and rejected – the Plaintiff's argument that her re-posting of the photograph constituted "fair use." Marcus Affidavit, ¶ 7. Finally, in her affidavit, Crosley-Corcoran states that prior to sending her takedown notices she consulted with counsel and, as a result, sent the takedown notice asking that her photograph be removed from Tuteur's blog. Crosley-Corcoran states that she "believed then, and believes now that this was a completely legitimate, legal, and appropriate use of a DMCA takedown notice."[2]

---

[2] Given that the Plaintiff herself has cited extensively to the Marcus Affidavit (see Show Cause Memorandum pp. 2-3) and given that she has been fully aware of the Marcus, Bilbrey, and Crosley-Corcoran Affidavits well in advance of filing her Memorandum, she cannot now be heard to complain of the Court's consideration of the same. *See, e.g., Gargano v. Liberty Int'l Underwriters, Inc*., 575 F. Supp. 2d 300, 303 (D. Mass. 2008)(" the policy providing the basis of the general rule against looking outside the complaint is to prevent unfair surprise to the plaintiff"); *Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991)("A finding that plaintiff has had notice of documents used by defendant in a 12(b)(6) motion is significant since, as noted earlier, the problem that arises when a court reviews statements extraneous to a complaint generally is the lack of notice to the plaintiff that they may be so considered; it is for that reason -- requiring notice so that the party against whom the motion to dismiss is made may respond -- that Rule 12(b)(6) motions are ordinarily converted into summary judgment motions. Where plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated."). Consideration of outside documents is particularly appropriate where, as here, the Plaintiff has herself cited to the documents "in order to bolster their argument against defendants' motions to dismiss." *Watterson v. Page*, 987 F.2d 1, 4 (1st Cir. 1993). *See also Airframe Sys. v. Raytheon Co.,* 520 F. Supp. 2d 258, 263 (D. Mass. 2007)("Given the rationale behind the default rule, courts are particularly agreeable to viewing documents offered by the plaintiff in his effort to defeat the motion…") Alternately, the Court, having given the Plaintiff a full and fair opportunity to show cause why this matter should not be dismissed (along with the

Taken together, these three affidavits are game, set, and match for the Plaintiff's § 512(f) claim. This is so because the test applicable to a § 512(f) claim is one of underlined subjective good faith. *Rossi v. Motion Picture Association of America*, 391 F.3d 1000, 1004 (9th Cir. 2004)("When enacting the DMCA, Congress could have easily enacted an objective standard of reasonableness. The fact that it did not do so indicates an intent to adhere to the subjective standard traditionally associated with a good faith requirement"); *Oulette v. Viacom International, Inc.*, 2012 U.S. Dist. LEXIS 68109, *7-8 (D. Mont. 2012)("The Ninth Circuit has interpreted §512(f) as setting a high bar for plaintiffs. Whether a copyright owner issued its takedown notice in 'good faith' is analyzed under a subjective standard"); *UMG Recordings, Inc. v. Augusto*, 558 F. Supp. 2d. 1055, 1065 "Under §512(f) of the DMCA, a copyright owner may be held liable for damages caused by an erroneous invocation of the notice and takedown provision only if the owner did not possess a subjective good faith belief that its copyright was being infringed"); *Dudnikov v. MGA Entertainment, Inc.*, 410 F. Supp. 2d. 1010, 1012 (D. Colo. 2005)("the good faith standard under § 512(c) is a subjective rather than an objective standard based on the fact that a cause of action under §512(f) is expressly limited to those situations where the copyright owner's notification is a 'knowing' and 'material' misrepresentation"); *Lenz v. Universal Music Corp.*, 2013 U.S. Dist. LEXIS 9799 (N.D. Cal. 2013)(discussing application of the *Rossi* subjective good faith test).

As the only appellate-level examination of § 512(f), the *Rossi* case is particularly instructive. In *Rossi*, the plaintiff operated a website at www.internetmovies.com, that

---

Plaintiff having full access to the Bilbrey, Marcus, and Crosley-Corcoran Affidavits) could also convert the present motion to a motion for summary judgment since there would be no "surprise" or "unfairness" to the Plaintiff in doing so. *Giragosian v. Ryan*, 2008 U.S. App. LEXIS 23082 (1st Cir. 2008)("Conversion is improper if it 'would come as a 'surprise' or be 'unfair' to the party against whom judgment is rendered.")

included on its home page statements including "Join to download full length movies online now! New movies every month"; "Full Length Downloadable Movies"; and "NOW DOWNLOADABLE." *Id.* at 1001-1002 (emphasis in original). The home page also included graphics from the defendant Motion Picture Association of America's ("MPAA") copyrighted films. *Id.* at 1002. After viewing the site, the MPAA "sent several notices to Rossi and Rossi's Internet Service Provider (ISP) informing them of the asserted infringement." *Id.* Before sending the takedown notices, the MPAA "did not attempt to download any movies from Rossi's website or any links to the site." *Id.* And, despite the site's apparent claims to the contrary, the Plaintiff asserted that "if the MPAA had reasonably investigated the site by attempting to download movies, it would have been apparent that no movies could actually be downloaded from this website or related links." *Id.* According to the plaintiff, had the MPAA conducted even this minimal investigation (i.e., clicking on the links at the site), "it would have inevitably concluded that Rossi's website could not possibly have been providing a source for downloading movies." *Id.*

In rejecting the notion that a content owner was required to conduct a pre-takedown notice investigation, the *Rossi* Court held:

> Congress included an expressly limited cause of action for improper infringement notifications, imposing liability only if the copyright owner's notification is a knowing misrepresentation. A copyright owner cannot be liable simply because an unknowing mistake is made, even if the copyright owner acted unreasonably in making the mistake. See § 512(f). Rather, there must be a demonstration of some actual knowledge of misrepresentation on the part of the copyright owner. Id.

> Juxtaposing the "good faith" proviso of the DMCA with the "knowing misrepresentation" provision of that same statute reveals an apparent statutory structure that predicated the imposition of liability upon copyright owners only for knowing misrepresentations regarding allegedly infringing websites. Measuring compliance with a lesser "objective reasonableness" standard would be inconsistent with Congress's apparent intent that the statute protect potential violators from subjectively improper actions by copyright owners.

*Id.* at 1004-05.

In the present case, Tuteur alleges that Crosley-Corcoran did not fully investigate Tuteur's claims of fair use prior to sending her takedown notices. This Court held, however, that:

> there is no requirement in the DMCA that a notice-giver inform the service provider of an infringer's possible affirmative defenses, only that she affirm her good faith belief (as appears to be the case here) that the copyrighted material is being used without her (or her agent's) permission. Seen in this light, there is no material misrepresentation by Crosley-Corcoran of infringement, as a viable cause of action under section 512(f)(1) would require.

April 10, 2013 Order, pp. 5-6.

Other § 512(f) decisions involving affirmative defenses have come to similar conclusions. *See, e.g., Ouelette, supra* (allowing defendants' motion for judgment on the pleadings even though plaintiff alleged that defendant utilized "scanning software" that could not consider "fair use" to identify potentially infringing works and despite allegations that the defendant had a "history" of using the software to "abuse the takedown process"); *UMG Recordings, Inc., supra,* (despite the fact that the defendant was ultimately entitled to a "first sale" defense, plaintiff could not be held liable under § 512(f) given that its takedown notice was sent with subjective good faith).

This Court's holding is particularly apt with respect to questions of fair use, given that Congress intended the DMCA to "balance the need for rapid response to potential infringement with the end-users' legitimate interests in not having material removed without recourse." *Sen. Rep. No.* 105-190 at 21 (1998), *quoted in Rossi,* supra, at 1003. A requirement that a rights-holder conduct a full "fair use" analysis prior to issuing a takedown notice would be inconsistent with the legislative intent of providing for a "rapid

response" given that, "usually, fair use determinations are so clouded that one has no sure idea how they will fare until the matter is litigated." 3 Nimmer on Copyright, §12B.08 at 12B-93, n.16. "In the case of a fair use defense, it might even take successive reversals at every level of review, up to and including the Supreme Court, before the winner's identity is established." *Id.* at 12B-91 and n.1.

The Plaintiff, however points to the *Lenz* decisions (*Lenz v. Universal Music Group*, 2013 U.S. Dist. LEXIS 9799 (N.D. Cal 2013) and *Lenz v. Universal Music Group*, 572 F. Supp. 2d. 1150 (N.D. Cal. 2008)) as standing for the opposite proposition, namely that, in order to have a "good faith belief" that a work infringes, the rightsholder must give some consideration to the question of "fair use" prior to sending a DMCA takedown notice. The Plaintiff is correct that the *Lenz* decisions stand for that proposition, but incorrect that the decisions advance her argument in this case.

Preliminarily, it is far from certain that *Lenz* reached the correct conclusion. In *Lenz,* the Court treated works that qualify as fair use as non-infringing as opposed to infringement that is excused as a matter of law. *Lenz*, 572 F. Supp. 2d at 1154-55. Given the First Circuit's position that fair use is an affirmative defense (*see, e.g., Society of the Holy Transfiguration Monastery, Inc. v. Archbishop Gregory of Denver, Colo.*, 689 F.3d 29, 59-65 (1st Cir. 2012)), the assumptions underlying *Lenz* might lead this court and the First Circuit to a different conclusion. It is, however, an issue that this Court need not resolve here because there is no question but that, even under *Lenz*, the Plaintiff cannot prevail here.

The *Lenz* case involved a 29 second long video filmed and posted to YouTube by Plaintiff Stephanie Lee, who "videotaped her young children dancing in her family's

kitchen. The song 'Let's go Crazy' by the artist professionally known as Prince played in the background." *Lenz*, 2013 U.S. Dist. LEXIS 9799 at *2. Universal Music Corp., which owns the copyright to "Let's Go Crazy," sent a DMCA takedown notice to YouTube. *Id.* Universal assigned the task of monitoring YouTube for copyright violations of Prince's songs to a single (non-lawyer) employee, Sean Johnson. *Id.* at *2 and *14. Johnson "gave no indication that he considered fair use before deciding whether to place Lenz's video on the removal list." *Id.* at *15. Indeed, Johnson "was not given any information or training about fair use" (*Id.* at 22) and Universal "admitted failure to consider fair use before sending its takedown notice…." *Id.* at *18.

While *Lenz* agreed that "requiring a copyright holder to engage in a full-blown fair use analysis prior to sending a DMCA takedown notice would be inconsistent with the remedial purpose of the statute" it concluded that "a copyright owner must make at least an initial assessment as to whether the fair use doctrine applies to the use in question in order to make a good faith representation that the use is not 'authorized by law.'" *Id.* 17-18. The *Lenz* court did not stop there, though. Even having concluded that Universal had admitted to not considering fair use was not sufficient. According to *Lenz*, in order to violate the provisions of § 512(f), the Plaintiff must also show that it "willfully blinded itself as to whether any given video might constitute fair use." *Id.* at *20. "In order to establish willful blindness on the part of a defendant, a plaintiff must establish two factors: "(1) the defendant must subjectively believe that there is a high probability that a fact exists, and (2) the defendant must take deliberate actions to avoid learning of that fact." *Id.* at 21, *quoting Global Tech. Appliances, Inc. v. SEB SA*, 131 S.Ct. 2060, 2070 (2011).

With this background, it is easy to see that *Lenz* – even if correctly decided – does not support a different result in this case. Lenz stands only for the proposition that, in making an initial determination of infringement, the rights holder needs to consider whether fair use might apply. It is undisputed and indisputable that this occurred here. As a layperson, Crosley-Corcoran did the only thing that could be required of her: she consulted counsel concerning her rights under the DMCA. This, in and of itself, fulfilled any obligation that she may have had under a subjective good faith test. *See, e.g.*, *Hultgren v. County of Lancaster*, 753 F. Supp. 809, 832 (D. Neb. 1989)("Case law on this issue indicates that acts or omissions on advice of counsel or other professional support a finding, under a subjective test, that the employer acted in good faith…"); *Lane v. M's Pub, Inc.*, 435 F. Supp. 917 (D. Neb. 1977)(employer met subjective good faith standard in relying on advice of accountant even if the advice was ultimately incorrect); *Demkowicz v. Endry*, 411 F. Supp. 1184, 1189 (S.D. Ohio 1975)(court found that defendants acted in "subjective good faith" where "the decision of the defendants not to accede to the demand of plaintiff's counsel was made on advice of counsel"); *Evans v. Secretary of Dep't of Health & Human Servs.*, 1992 U.S. Cl. Ct. LEXIS 471 (Cl. Ct. Oct. 1, 1992)("The court has no reason to doubt that the petition was brought in good faith. The 'good faith' requirement is subjective, and it is likely that the petitioner, relying on the advice of counsel after providing him with the facts, honestly believed he had a legitimate claim for compensation.")

Moreover, it is undisputed and indisputable that Crosley-Corcoran's attorney, Jake Marcus, a practitioner with almost twenty-five years of experience ***explicitly considered (and rejected) Tuteur's fair use claim prior to the sending of the takedown notices.*** *See*

Marcus Affidavit, ¶ 7 and Exhibit A to Marcus Affidavit ("As regards your Fair Use argument, on behalf of my client I reject that as well. As I am sure you know, 'illustrative' and 'transformative' are quite different. Ms. Tuteur cannot use Fair Use as a defense to taking and using a photograph owned by Ms. Crosley-Corcoran."). In sending her takedown notices, Crosley-Corcoran relied in good faith on the advice provided to her by her counsel. Crosley-Corcoran Affidavit, ¶ 18.

Under any standard – including the *Lenz* test urged by the Plaintiff – nothing more was required and Tuteur's §512(f) claim must be dismissed.

III.     Tuteur's State Law Claim For Tortious Interference With Contracts Must Be Dismissed.

As this Court correctly noted in its April 10 Order, a finding that Crosley-Corcoran did not violate § 512(f), by necessity precludes a claim for tortious interference because "there would seem nothing improper about the purpose of Crosley-Corcoran's takedown notice, which was to stop what she believed was an infringement of her copyrighted likeness, while the means that she chose, sending a the notice to the service provider, was one explicitly authorized by the statute." April 10 Order, p. 6. This decision is in accord with other federal courts that have considered the issue. *See, e.g., Rossi, supra* at 1006 (holding that court's finding of good faith precluded a state law claim for interference with prospective economic advantage); *Dudnikov v. MGA Entertainment, Inc.*, 410 F. Supp. 2d 1010, 1014 (D. Colo. 20005)("Improper interference is an essential element of a tortious interference claim. Because I agree with Magistrate Judge Coan's finding that the defendant acted in good faith, I uphold dismissal of Plaintiffs' state law tort claims for tortious interference with contract/business relations….").

There is, however, an even more basic reason why Count II of Tuteur's complaint must be dismissed (separate and apart from any holding concerning the DMCA count): the state law claim is preempted by § 512(f). *Online Policy Group v. Diebold, Inc.*, 337 F. Supp. 2d 1195, 1205-06 (N.D. Cal. 2004)("The Court agrees with Diebold that on the facts of this case the claim is preempted. …If adherence to the DMCA's provisions simultaneously subjects the copyright holder to state tort law liability, there is an irreconcilable conflict between state and federal law"); *Amaretto Ranch Breedables, LLC v. Ozimals, Inc.,* 2011 U.S. Dist. LEXIS 73853, *10-17 (N.D. Cal. 2011)(finding that preemption applied to the plaintiff's state law claims which were "based in whole, or in part, on Ozimals sending allegedly baseless DMCA Takedown Notification to Linden Research, Inc." because: "(1) a DMCA Takedown Notification is a creature of a federal statutory regime, and (2) that regime preempts any state law claim based on an allegedly improper DMCA takedown notification"); *Lenz v. Universal Music Corp. ("Lenz I"),* 2008 U.S. Dist. LEXIS 44549, *12-13 (discussing section 512(f) and stating that "'given that a special provision of the Copyright Act itself regulates misrepresentations in such notifications, that provision constitutes the sole remedy for a customer who objects to its contents and their effects.' Accordingly, the Court will dismiss Lenz's second claim based in state law because it is preempted by federal law")(*quoting* 1 Nimmer on Copyright 1.01[B][3][a] at 1-77).

Because Count II of the Plaintiff's Complaint is unquestionably based entirely on Tuteur's claim that Crosley-Corcoran improperly sent takedown notices in violation of § 512(f), her state law claim for tortious interference with contractual relations must be dismissed.

## CONCLUSION

For the reasons stated hereinabove, the Plaintiff's complaint should be dismissed in its entirety for failure to state a claim upon which relief may be granted.[3]

Respectfully submitted,

GINA CROSLEY-CORCORAN

By her attorney,

/s/ Evan Fray-Witzer

Evan Fray-Witzer (BBO# 564349)
Ciampa Fray-Witzer, LLP
20 Park Plaza, Suite 505
Boston, MA 02116
Tel: (617) 426-0000
Fax: (617) 423-4855
Evan@CFWLegal.com

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on May 9, 2013.

/s/ Evan Fray-Witzer

---

[3] Having fully briefed the personal jurisdiction issue – and having sought and been granted leave only to address the substantive merits of the case - Crosley-Corcoran has not replied to Tuteur's arguments concerning personal jurisdiction (including significant factual misrepresentations made by Tuteur). If the Court desires additional briefing on the question of personal jurisdiction, Crosley-Corcoran would be happy to provide the same to the Court.