UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMY TUTEUR, M.D., <br><br> Plaintiff, <br><br> vs. <br><br> GINA CROSLEY-CORCORAN, <br><br> Defendant. | CIVIL ACTION No. 13-cv-10159-RGS <br><br> **LEAVE TO FILE GRANTED ON MAY 20, 2013** |

**BRIEF OF *AMICUS CURIAE* MOTION PICTURE ASSOCIATION OF AMERICA, INC. IN SUPPORT OF NEITHER PARTY**

Daniel J. Cloherty (BBO #565772)
dcloherty@collorallp.com
COLLORA LLP
100 High Street
Boston, MA 02110-2321
Telephone: (617) 371-1000
Facsimile: (617) 371-1037

Dated: May 21, 2013

*Counsel for Amicus Curiae Motion Picture Association of America, Inc.*

On the brief:

Kelly M. Klaus
Jonathan H. Blavin
Kelly.Klaus@mto.com
Jonathan.Blavin@mto.com
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA  90071-1560
Telephone:    (213) 683-9100
Facsimile:    (213) 687-3702

## TABLE OF CONTENTS

                                           **Page**

I.   INTRODUCTION ...................................................................................................1

II.   ARGUMENT ..........................................................................................................2

    A.   Section 512(f) Provides a Limited Remedy Against Those Who Have Actual, Subjective Knowledge They Are Materially Misrepresenting That Material or Activity Is Infringing ............................................2

    B.   Section 512(f) Does Not Impose Liability If a Copyright Owner Has Not "Considered" Fair Use Before Sending a Takedown Notice .........................6

    C.   Imposing Liability Based on Mere Failure to Consider Fair Use Would Impose Significant and Unwarranted Burdens .................................................11

III.   CONCLUSION ....................................................................................................14

# TABLE OF AUTHORITIES

Page

**FEDERAL CASES**

*Biosafe-One, Inc. v. Hawks*,
   524 F. Supp. 2d 452 (S.D.N.Y. 2007) .......................................................................... 6

*Blanch v. Koons*,
   467 F.3d 244 (2d Cir. 2006) ........................................................................................ 8

*Cabell v. Zimmerman*,
   2010 WL 996007 (S.D.N.Y. Mar. 12, 2010) .......................................................... 5, 6

*Campbell v. Acuff-Rose Music, Inc.*,
   510 U.S. 569 (1994) ................................................................................................ 7, 8

*Doe v. Geller*,
   533 F. Supp. 2d 996 (N.D. Cal. 2008) ...................................................................... 12

*Dudnikov v. MGA Entm't, Inc.*,
   410 F. Supp. 2d 1010 (D. Colo. 2005) ........................................................................ 6

*Harper & Row, Publishers, Inc. v. Nation Enters.*,
   471 U.S. 539 (1985) ................................................................................................ 7, 8

*Jacobellis v. Ohio*,
   378 U.S. 184 (1964) .................................................................................................... 8

*Lenz v. Universal Music Corp.*,
   572 F. Supp. 2d 1150 (N.D. Cal. 2008) ......................................................... 9, 10, 12

*Lenz v. Universal Music Corp.*,
   2008 WL 4790669 (N.D. Cal. Oct. 28, 2008) ........................................................... 10

*Lenz v. Universal Music Corp.*,
   2013 WL 271673 (N.D. Cal. Jan. 24, 2013) ............................................................. 10

*Monge v. Maya Magazines, Inc.*,
   688 F.3d 1164 (9th Cir. 2012) ............................................................................... 8, 11

*Online Policy Group v. Diebold, Inc.*,
   337 F. Supp. 2d 1195 (N.D. Cal. 2004) ...................................................................... 6

*Ouellette v. Viacom*,
   2011 WL 1882780 (D. Mont. March 31, 2011) .......................................................... 4

*Perfect 10, Inc. v. Amazon.com, Inc.*,
   508 F.3d 1146 (9th Cir. 2007) ................................................................................ 7, 9

# TABLE OF AUTHORITIES

Page

*Perfect 10, Inc. v. Cybernet Ventures, Inc.*,
   213 F. Supp. 2d 1146 (C.D. Cal. 2002) ..............................................................4

*Princeton Univ. Press v. Michigan Document Servs., Inc.*,
   99 F.3d 1381 (6th Cir. 1996) ..............................................................................8

*Rossi v. MPAA*,
   391 F.3d 1000 (9th Cir. 2004) ................................................................... passim

*Society of Holy Transfiguration Monastery, Inc. v. Gregory*,
   689 F.3d 29 (1st Cir. 2012) .................................................................................7

*Third Educ. Group, Inc. v. Phelps*,
   675 F. Supp. 2d 916 (E.D. Wis. 2009) ................................................................6

*UMG Recordings, Inc. v. Augusto*,
   558 F. Supp. 2d 1055 (C.D. Cal. 2008) ...............................................................6

**STATUTES AND RULES**

17 U.S.C. § 107 ........................................................................................................7, 8, 9

17 U.S.C. § 512(a)-(d) ....................................................................................................3

17 U.S.C. § 512(c) ..............................................................................................5, 6, 7, 9

17 U.S.C. § 512(f) .................................................................................................. passim

17 U.S.C. § 512(g) .......................................................................................................3, 9

17 U.S.C. § 512(l) ............................................................................................................7

**LEGISLATIVE HISTORY**

H.R. Rep. No. 102-836 (1992) (report on 1992 amendment to § 107) ..........................7

H.R. Rep. No.105-551, pt. 1 (1998) ................................................................................2

H.R. Rep. No. 105-551, pt. 2 (1998) ...............................................................................3

S. Rep. No. 105-190 (1998) ...................................................................................2, 3, 11

S. Rep. No. 105-190 (1998) .............................................................................................3

## TABLE OF AUTHORITIES

**Page**

**OTHER AUTHORITIES**

4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.05, at 13-156 (Matthew Bender, rev. ed.) ....................9

David Nimmer, *"Fairest of Them All" and Other Fairy Tales of Fair Use* ....................9

I.  **INTRODUCTION**

*Amicus* Motion Picture Association of America, Inc. ("MPAA") takes no position on the merits of this case or whether it should be dismissed at this juncture. However, the filings by Plaintiff and her *Amici*, Electronic Frontier Foundation ("EFF") and Digital Media Law Project ("DMLP"), in response to the Court's April 10, 2013 Order (Dkt. No. 30), appear to be calculated to make this case stand for a sweeping—and incorrect—principle of law. In particular, Plaintiff and *Amici* ask the Court to hold as a matter of law that a copyright owner who sends a Digital Millennium Copyright Act ("DMCA") "takedown" notice may be held liable for making a "knowing[] material[] misrepresent[ation]" under 17 U.S.C. § 512(f), on the ground that the owner did not "consider[]" whether the use of the copyrighted work would qualify for the affirmative defense of fair use, *id.* § 107.

The MPAA respectfully submits that such an interpretation of § 512(f) is wrong and threatens to cause significant harms that Congress could not possibly have intended. The MPAA's interest in this matter is not academic. The MPAA and its members confront the piracy of their works by Internet actors on a massive global scale.[1] One of the only means that the MPAA and its members have to ensure that Internet services that carry, host, or link to such content take steps not to facilitate such rampant piracy is through the DMCA's notice-and-takedown provisions. The rule that Plaintiff and *Amici* advocate, if carried to its logical conclusion, would impose significant and unwarranted burdens on copyright owners like the MPAA and its members who unfortunately must send literally millions of takedown notices every year to combat the mass infringement of their works on the Internet.

---

[1] The members of the MPAA are Paramount Pictures Corporation, Sony Pictures Entertainment Inc., Twentieth Century Fox Film Corporation, Universal City Studios LLC, Walt Disney Studios Motion Pictures and Warner Bros. Entertainment Inc.

The rule that *Amici* ask this Court to adopt is neither justified by the statute, the leading appellate authority construing it, nor sound policy. Liability under § 512(f) arises only where the copyright owner has actual, subjective knowledge that it is making a material misrepresentation that the use of the copyrighted work is infringing. *See Rossi v. MPAA*, 391 F.3d 1000, 1004-05 (9th Cir. 2004). Nothing in § 512(f) or any other part of the DMCA says, or reasonably can be construed to mean, that the copyright owner is making a knowing, affirmative misrepresentation that material or activity is infringing if the owner has not "considered" an affirmative defense. Because of the ease of uploading and magnitude of infringing content online, the MPAA and its members have to send literally millions of takedown notices every year. The requirement that Plaintiff and *Amici* propose—that a copyright owner precede every takedown notice with a consideration of the potential applicability of fair use (as well as other affirmative defenses), or else face a federal action under § 512(f)—threatens to make the meaningful relief that Congress envisioned under the DMCA's notice and takedown provisions a practical impossibility. However the Court decides the pending motion, the MPAA respectfully urges the Court to resist Plaintiff's and *Amici*'s invitation.

## II. ARGUMENT

### A. Section 512(f) Provides a Limited Remedy Against Those Who Have Actual, Subjective Knowledge They Are Materially Misrepresenting That Material or Activity Is Infringing

In enacting the DMCA, Congress understood that "copyright industries are one of America's largest and fastest growing economic assets," S. Rep. No. 105-190, at 10 (1998), but that the ease with which digital files can be disseminated across the Internet "will unfortunately ... facilitate pirates who aim to destroy the value of American intellectual property." H.R. Rep. No.105-551, pt. 1, at 9 (1998).

The so-called "safe harbor" provisions of § 512 of the Copyright Act define the circumstances in which certain Internet "service providers" may limit their liability for infringement by third parties that utilize their services. 17 U.S.C. § 512(a)-(d). Congress expressly intended for § 512 to "preserve[] strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in the digital networked environment." S. Rep. No. 105-190, at 20 (1998). Section 512 has several prerequisites that a service provider must satisfy in order to be eligible for the safe harbors under the statute. One such requirement is that certain service providers maintain and implement "notice and takedown" procedures, by means of which copyright holders inform service providers of infringing material accessible through their sites, and service providers must then "act[] expeditiously to remove, or disable access to" it in order to maintain eligibility for the § 512(c) safe harbor.

Congress intended for § 512 to "balance *the need for rapid response to potential infringement* with the end-users legitimate interests in not having material removed without recourse." S. Rep. No. 105-190, at 21 (1998) (emphasis added). Importantly, Congress recognized that parties whose material or activity was removed or access to which was blocked might believe that their use was not infringing, and that it should be restored. To that end, Congress created statutory counter-notification and "put-back" procedures to protect "third parties' interests in ensuring that material not be taken down." H.R. Rep. No. 105-551, pt. 2, at 59 (1998). The statute provides that persons whose material is removed may send a counter-notification if they believe that the removal was made in error. 17 U.S.C. § 512(g)(3). The counter-notification then starts a 14-day clock for the copyright owner to evaluate the claimed error. Within that time, the copyright owner must file an infringement action, and if no such

action is filed, the service provider must restore the material to retain its eligibility for the safe harbor. *See, e.g., Ouellette v. Viacom*, 2011 WL 1882780, at *6 (D. Mont. March 31, 2011). These "notification and counter-notification requirements" are an "attempt to balance the duties of service providers, the rights of copyright owners and the rights of other users." *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1179 (C.D. Cal. 2002).

Congress also recognized that some takedown (and put-back) notices would result not from inadvertence or differences in opinion, but from knowing misrepresentations. To address this issue, in § 512(f) Congress included an "expressly limited cause of action" for "improper" notifications sent either under the takedown or re-posting provisions, "imposing liability *only if*" the "notification is a *knowing misrepresentation*" as to the infringing (or non-infringing) status of material or activity. *Rossi*, 391 F.3d at 1004-05 (emphases added). Section 512(f) provides:

> Any person who *knowingly materially misrepresents* under this section (1) that material or activity is infringing, or (2) that material or activity was removed or disabled by mistake or misidentification, shall be liable for any damages, including costs and attorneys' fees, incurred by the alleged infringer, by any copyright owner or copyright owner's authorized licensee, or by a service provider, who is injured by such misrepresentation, as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing, or in replacing the removed material or ceasing to disable access to it.

17 U.S.C. § 512(f) (emphasis added).

The leading decision on the meaning of this statute is *Rossi*, which makes clear that a plaintiff bears the burden of proving that the § 512(f) defendant had the *subjective* mental state of "actual knowledge" that it was materially misrepresenting that the material or activity was infringing. *Rossi*, 391 F.3d at 1004-05. In *Rossi*, the plaintiff operated a website that advertised "Full Length Downloadable Movies" and posted graphics for movies whose copyrights were owned by MPAA members. Following the procedures specified in the DMCA, the MPAA sent

4

notices of infringing conduct to Rossi and his Internet service provider. Rossi sued the MPAA for tortious interference with contract and other related torts. *Id.* at 1002. The MPAA argued that its compliance with the DMCA was a complete defense to Rossi's claims. Rossi, in contrast, claimed that the MPAA had not complied with the DMCA. He argued that, under an *objective* standard, the MPAA could not have formed a "good faith belief" that Rossi's site was making infringing material available, because "a reasonable investigation into" his website would have revealed that users could not actually download movies there. *Id.* at 1003.

The Ninth Circuit rejected Rossi's reading of the statute. The court held that the "interpretive case law and the statutory structure [of the DMCA] support the conclusion that the 'good faith belief' requirement in § 512(c)(3)(A)(v) *encompasses a subjective, rather than objective*, standard." *Id.* at 1004 (emphasis added).

> *In § 512(f), Congress included an expressly limited cause of action* for improper infringement notifications, *imposing liability only if the copyright owner's notification is a knowing misrepresentation. A copyright owner cannot be liable simply because an unknowing mistake is made, even if the copyright owner acted unreasonably in making the mistake. Rather, there must be a demonstration of some actual knowledge of misrepresentation on the part of the copyright owner.*

*Id.* at 1004-1005 (emphasis added) (citations omitted). The Ninth Circuit rejected the imposition of an "objective standard of review for gauging the reasonableness" of a copyright owner's "conduct in notifying" parties of an "allegedly infringing website." *Id.* at 1004. As the court stressed, a copyright owner cannot be liable under Section 512(f) *even if the copyright owner acted unreasonably in making the mistake. See* § 512(f). Rather, there must be a demonstration of *some actual knowledge of misrepresentation* on the part of the copyright owner." *Id.* at 1005 (emphasis added). *Rossi*'s reading of § 512(f) is clearly correct, and many courts around the country have followed it. *See Cabell v. Zimmerman*, 2010 WL 996007, at *4-5 (S.D.N.Y. Mar.

12, 2010); *Third Educ. Group, Inc. v. Phelps*, 675 F. Supp. 2d 916, 927 (E.D. Wis. 2009); *UMG Recordings, Inc. v. Augusto*, 558 F. Supp. 2d 1055, 1065 (C.D. Cal. 2008), *aff'd on other grounds*, *UMG Recordings, Inc. v. Augusto*, 628 F.3d 1175 (9th Cir. 2011); *Dudnikov v. MGA Entm't, Inc.*, 410 F. Supp. 2d 1010, 1013 (D. Colo. 2005) (all following *Rossi*).[2]

### B. Section 512(f) Does Not Impose Liability If a Copyright Owner Has Not "Considered" Fair Use Before Sending a Takedown Notice

Plaintiff and *Amici* argue that Section 512(f) imposes liability if the copyright owner has not "considered" fair use before sending a DMCA takedown notice. *See* Dkt No. 34 at 8-11; Dkt. No. 35-1 at 7-10. That is an incorrect statement of the law.

Nothing in § 512(f) or § 512(c)(3)(A)(v) says that there is liability under § 512(f) if the copyright owner does not "consider" fair use or other affirmative defenses that might be raised, were an infringement action to be filed against the party posting the material. Rather, as *Rossi* makes clear, there must be actual, subjective knowledge on the part of the person sending the notice that he or she is materially misrepresenting that the use of the material is infringing. *See Rossi*, 391 F.3d at 1005; *see also Cabell*, 2010 WL 996007, at *4-5 ("a defendant must have *actual knowledge* that it is making a misrepresentation"); *Biosafe-One, Inc. v. Hawks*, 524 F.

---

[2] Plaintiff and her *Amici* also rely on a "knew or should have known" standard, articulated in *Online Policy Group v. Diebold, Inc.*, 337 F. Supp. 2d 1195, 1204 (N.D. Cal. 2004). *See* Dkt. No. 34 at 15-17; Dkt. No. 35-1 at 9-10. *Diebold*'s "knew or should have known" construction of knowledge directly conflicts with, and does not survive, the Ninth Circuit's decision in *Rossi* that the knowledge standard is actual, subjective knowledge. As courts have made clear following *Rossi*, an "attack of the 'reasonableness' of [a copyright owner's] good faith belief on the ground" that the copyright owner "'*knew better*' than to conclude that" the content "was infringing [its] rights" is "misplaced" and "has no bearing on the good faith showing." *Dudnikov*, 410 F. Supp. 2d at 1017-18 (emphasis added); *see also Augusto*, 558 F. Supp. 2d at 1065 ("Augusto's allegations that UMG *should have known better* do not create a genuine issue of material fact as to this issue" under Section 512(f)) (emphasis added); *Cabell*, 2010 WL 996007, at *4-5 (holding that argument that "Defendant *should have known the real facts*" irrelevant because "negligence is *not the standard for liability under section 512(f)*") (emphases added).

Supp. 2d 452, 469 (S.D.N.Y. 2007) (plaintiff must establish that defendants "were aware or understood that they were misrepresenting the fact that [plaintiff's] website was infringing when they filed their notices").

*Amici* argue that it is necessary to read § 512(f) to make actionable a non-consideration of fair use in order to give meaning to a different part of § 512. Specifically, *Amici* argue that, unless a copyright owner is required to consider fair use before sending a takedown notice, then there is no meaning to the requirement that the owner declare its good faith belief that the use of the copyrighted material is not "authorized by the copyright owner, its agent, or the law." 17 U.S.C. § 512(c)(3)(A)(v). *Amici* are wrong. Fair use is an affirmative defense. It excuses conduct that otherwise is actionable as infringement, as the Supreme Court, the First Circuit, and numerous other courts and the Copyright Act's legislative history have made clear. *See Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 561 (1985) (Congress "structured [Section 107] as an affirmative defense"); *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994) (same); *Society of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 59 (1st Cir. 2012); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1163 (9th Cir. 2007); H.R. Rep. No. 102-836, at 3 n.3 (1992) (report on 1992 amendment to § 107) ("the burden of proving fair use is *always* on the party asserting the defense" (emphasis added)). Congress knew how to refer to defenses to infringement in § 512. *See* 17 U.S.C. § 512(l) (providing that service provider's "defense[s]" to infringement "under this title," which includes fair use, unaffected by the safe harbors). It did not use the word "defenses" in § 512(c)(3)(A)(v). Only if someone sending a takedown notice actually, subjectively knows that the underlying use is excused from liability by an affirmative defense, but sends a takedown notice anyway, then does § 512(f) come into play.

But there are sound structural and policy reasons to believe Congress did not intend the DMCA to require that every takedown notice be preceded by a consideration of the possible applicability of fair use, upon penalty of a suit under § 512(f) if such an inquiry is not made. As an affirmative defense, fair use serves to excuse a use that otherwise is infringing, not to create an affirmative right of use. Moreover, fair use requires an equitable balancing of multiple factors, including four factors set out in the text of Section 107.[3] The Supreme Court has emphasized that the fair use analysis does not lend itself to "bright-line rules, for the statute, like the doctrine it recognizes, calls for case-by-case analysis." *Campbell*, 510 U.S. at 577. "Since the doctrine is an equitable rule of reason, no generally applicable definition is possible, and each case raising the question must be decided on its own facts." *Harper & Row*, 471 U.S. at 560 (alteration, citation and internal quotation marks omitted). All of the statutory factors "are to be explored, and the results weighed together, in light of the purposes of copyright." *Campbell*, 510 U.S. at 578. "As the words of section 107 indicate, the determination of fair use is an open-ended and context-sensitive inquiry." *Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006).

Given this "open-ended" inquiry, considering the possible applicability of fair use is not some effortless, "I know it when I see it" type of exercise. *Cf. Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring). Fair use analysis can be difficult to predict, especially if one party is being asked to consider the best arguments of the alternative perspective on the use. *See Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1170 (9th Cir. 2012); *Princeton Univ. Press v. Michigan Document Servs., Inc.*, 99 F.3d 1381, 1392 (6th Cir. 1996). Indeed, the fact that the

---

[3] The statutory factors are "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107.

doctrine can be "malleab[le]," as one leading scholar has described it, means that giving meaningful consideration to fair use is bound to require significant effort. 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.05, at 13-156 (Matthew Bender, rev. ed.)[4]; *see also Amazon.com*, 508 F.3d at 1176-77 (Ninth Circuit held defendants' use of thumbnail images *was* fair use, whereas district court, based on same facts, held it was not).

Congress enacted the notice-and-takedown provisions to provide an "expeditious[]," "rapid response" system to *"potential infringement"* on the Internet, 17 U.S.C. § 512(c)(1)(A)(iii) & S. Rep. No. 105-190, at 21 (1998) (emphasis added). Given that objective, as well as the intention to create certainty and incentives for copyright owners and service providers through the safe harbors' limitations of liability, it is implausible that Congress intended for copyright owners to face liability for failing to engage in a complex and time-consuming consideration of this inherently fact-intensive area of copyright law. The statutory structure instead shows that Congress intended to address the potential for the fair use defense to be raised, considered, and if necessary litigated, through the counter-notification and "put-back" procedures, *see* 17 U.S.C. § 512(g)(1), (g)(2), and (g)(4).

Plaintiff and *Amici* rely heavily upon the district court's order denying a motion to dismiss a § 512(f) claim in *Lenz v. Universal Music Corp.*, 572 F. Supp. 2d 1150 (N.D. Cal.

---

[4] *See also* 3 Nimmer on Copyright § 12B.08, at 12B-145 & n.1 (observing that fair use determinations can be hotly contested and that even the same facts can be and often are evaluated differently; "it might even take adjudication up to and including the Supreme Court before the winner's identity is established."); *see also* David Nimmer, *"Fairest of Them All" and Other Fairy Tales of Fair Use*, 66 Law & Contemporary Problems 263, 269-80 (2003) (analyzing courts' analysis of § 107 factors in 60 cases and concluding that "had Congress legislated a dartboard rather than the particular four fair use factors embodied in the Copyright Act, it appears that the upshot would be the same"). The idea that fair use can be considered effortlessly and without time and expense burdens across millions of uses on the Internet is fanciful.

2008) ("*Lenz I*"). In that decision, the court stated that "in order for a copyright owner to proceed under the DMCA with 'a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law,' the owner must evaluate whether the material makes fair use of the copyright." *Id.* at 1154 (quoting 17 U.S.C. § 512(c)(3)(A)(v)). The other cases Plaintiff and *Amici* cite for this proposition simply repeat this language without independently evaluating the issue, *see, e.g.,* Dkt. No. 35-1 at 8. Even at the dismissal stage, however, the *Lenz* court qualified its holding by stating that "a full investigation to verify the accuracy of a claim of infringement is not required," and that the court "did not hold that every takedown notice must be preceded by a full fair use investigation." 572 F. Supp. 2d at 1155-56; *Lenz v. Universal Music Corp.*, No. C-07-3783-JF, 2008 WL 4790669, at *2-3 (N.D. Cal. Oct. 28, 2008) ("*Lenz II*") (denying to certify dismissal order for interlocutory appeal). And, the *Lenz* court's recent order denying cross-motions for summary judgment, from this past January, clarified that "in light of *Rossi*," the "mere failure to consider fair use *would be insufficient* to give rise to liability under § 512(f)" and that a plaintiff "must demonstrate" that a defendant "had some actual knowledge that its Takedown Notice contained a material misrepresentation." *Lenz v. Universal Music Corp.*, No. C-07-3783-JF, 2013 WL 271673, at *6 (N.D. Cal. Jan. 24, 2013) ("*Lenz III*"); *see also id.* at *7 n.3 ("an inadvertent failure to consider fair use would be insufficient to impose § 512 liability in light of *Rossi*").

The DMCA cannot be reasonably construed to require copyright owners prior to sending out every takedown notice to engage in a speculative *ex ante* inquiry into the merits of a fair use defense, lest they be subject to a lawsuit under § 512(f). Such an interpretation is inconsistent with the plain language of the DMCA, governing case law interpreting § 512(f), and decades of authority on the fair use defense.

10

### C. Imposing Liability Based on Mere Failure to Consider Fair Use Would Impose Significant and Unwarranted Burdens

It is highly impractical and counter to Congress's intent to require that a copyright owner consider and evaluate the four fair use factors before sending any takedown notice or otherwise face potential liability. As one court has aptly described it, fair use is a task that requires "considered legal judgment" and "put[ting] [the analysis of those factors] in the judicial blender to find the appropriate balance." *Monge*, 688 F.3d at 1183. Forcing copyright owners to engage in a highly time-consuming fair use analysis before sending out any takedown notice would substantially slow down and significantly impede the expeditious notice-and-takedown procedures which Congress included in the safe harbor prong of the DMCA.

As discussed, Congress intended for § 512 to "balance *the need for rapid response to potential infringement* with the end-users legitimate interests in not having material removed without recourse." S. Rep. No. 105-190, at 21 (1998) (emphasis added) (quoted in *Rossi*, 391 F.3d at 1003). The task of keeping up with the sheer quantity of content available through the Internet already is enormous. For example, YouTube, which is a large but by no means the only site that hosts content that users post, reports that "72 hours of video are uploaded to YouTube *every minute*." http://www.youtube.com/yt/press/statistics.html (last visited May 9, 2013) (emphasis added). Given the exponential pace at which content is easily posted or linked through on the Internet, and the fact that infringing material can be re-posted or moved faster than it can be noticed, it is vital that copyright owners have the ability to send out DMCA takedown notices quickly and efficiently. To illustrate the point with just one example, Google has reported that in the last month alone it received over *18 million requests* to remove URLs,

*i.e.,* links to websites showing up in Google search results, containing infringing material.[5] The requests to Google are only a part of the massive number of takedown notices copyright owners are forced to send to service providers, which include requests to other search engines and services that host websites containing infringing material. If every single one of these takedown requests constituted a violation of § 512(f) if the copyright owner did not engage in an individualized fair use analysis, the burden of time and resources required to conduct that review would effectively make it impossible for there to be any meaningful relief under the notice and takedown procedures.

*Amici* suggest that the DMCA's counter-notification procedure does not sufficiently address time-sensitive takedowns. *See* Dkt. No. 35-1 at 12-13. As an initial matter, *Amici*'s cries about the potential mischief that will be caused if fair use is raised through the statute's counter-notification procedures are unfounded. Neither this case, nor the *Lenz* case, nor other § 512(f) cases filed by *Amici* counsel under § 512(f) (*e.g.*, *Doe v. Geller*, 533 F. Supp. 2d 996 (N.D. Cal. 2008), concerning a takedown notice for a video about a spoon-bending "paranormalist"), involve alleged takedown abuses calculated to inflict maximum harm in a time-sensitive situation. *Amici* cite blog postings written by *Amici's* lawyers as evidence of the election-season mischief that the counter-notification procedures allegedly are inadequate to address. *See* Dkt. No. 35-1 at 12-13. The examples hardly demonstrate the existence of either a

---

[5] http://www.google.com/transparencyreport/removals/copyright/ (last visited May 9, 2013). The MPAA's members and their affiliates are among the top senders of such notices to Google regarding search results. For example, according to Google's Transparency Report figures, in the past month alone, the MPAA's members sent more than 3.2 million notices in total just with respect to Google search results. And even that figure likely *understates* the number of notices sent by the members and their affiliates, given the way Google reports the figures. *See* http://www.google.com/transparencyreport/removals/copyright/owners/?r=last-month (last visited May 9, 2013).

current or looming crisis in this area. In one example, the takedown notice was directed to the Romney presidential campaign's use of Al Green's "Let's Stay Together" in a campaign ad. The campaign, however, did not even contest the takedown, and so the incident really sheds no light on the adequacy of the counter-notification procedures. In the second example, a production company copyright owner—not a competing campaign—sent a notice about an unauthorized use of a film clip in a commercial for a candidate in Ohio. The service provider restored the posting ahead of the 14-day period. *See* Dkt. No. 35-1 at 13 & webpages cited therein. Moreover, in the real-world experience of the MPAA and its members, the numbers of either counter-notifications or other communications asserting either fair use or any type of mistake in the takedown process are negligible, both as an absolute number and in proportion to the massive number of takedown notices the members must constantly send. The hypothetical harms that *Amici* imagine pale in comparison to the very real harms that copyright owners confronting mass piracy would face if every DMCA takedown notice put them at risk of § 512(f) liability absent an *ex ante*, individualized consideration of fair use.

## III. CONCLUSION

As stated at the outset, the MPAA takes no position on how this case or motion should be resolved. The MPAA respectfully submits, however, that the rule that Plaintiff and her *Amici* advocate would impose enormous and unjustified burdens on the notice-and-takedown process, and would encourage and incentivize the filing of more § 512(f) actions that could and should be resolved through the counter-notification process, which Congress provided in its wisdom.

Respectfully submitted,

*/s/ Daniel J. Cloherty*
Daniel J. Cloherty (BBO #565772)
dcloherty@collorallp.com
COLLORA LLP
100 High Street
Boston, MA 02110-2321
Telephone:   (617) 371-1000
Facsimile:   (617) 371-1037

Dated:  May 21, 2013

*Counsel for Amicus Curiae Motion Picture Association of America, Inc.*

On the brief:

Kelly M. Klaus
Jonathan H. Blavin
Kelly.Klaus@mto.com
Jonathan.Blavin@mto.com
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071-1560
Telephone:   (213) 683-9100
Facsimile:   (213) 687-3702

14