# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMY TUTEUR, M.D., | ) |
| | ) |
| Plaintiff, | )    Civil Action No. 13-cv-10159 MBB |
| | ) |
| v. | )    **LEAVE TO FILE GRANTED** |
| | )    **MAY 20, 2013** |
| GINA CROSLEY-CORCORAN, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## BRIEF OF *AMICI CURIAE* ELECTRONIC FRONTIER FOUNDATION AND DIGITAL MEDIA LAW PROJECT

Respectfully submitted,

/s/ Christopher T. Bavitz
Christopher T. Bavitz (BBO# 672200)
cbavitz@cyber.law.harvard.edu
CYBERLAW CLINIC
Harvard Law School
Berkman Center for Internet & Society
23 Everett Street, 2nd Floor
Cambridge, MA 02138
Telephone:  (617) 495-7547
Facsimile: (617) 495-7641

*Counsel for Amici Curiae Electronic Frontier Foundation and Digital Media Law Project*

Dated:  May 1, 2013

On the brief:

Daniel Nazer
daniel@eff.org
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, California 94109
Telephone: (415) 436-9333
Facsimile: (415) 436-9993

Jeffrey P. Hermes (BBO# 637952)
jhermes@cyber.law.harvard.edu
Andrew F. Sellars (BBO# 682690)
asellars@cyber.law.harvard.edu
DIGITAL MEDIA LAW PROJECT
Berkman Center for Internet & Society
23 Everett Street, 2nd Floor
Cambridge, MA 02138
Telephone:  (617) 495-7547
Facsimile: (617) 495-7641

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 3

    A.       The DMCA was enacted to promote online innovation and free expression. .......... 3

    B.       Tuteur's Complaint states a claim under Section 512(f), because it alleges that
               Crosley-Corcoran knowingly misrepresented in her takedown notices that she
               had a good faith belief that Tuteur's use was "not authorized by . . . the law." ....... 7

           1.       Section 512(f) imposes liability for knowing misrepresentations
                      regarding uses authorized by law – including fair uses ............................... 7

           2.       Tuteur has sufficiently alleged that Crosley-Corcoran's takedown
                      notice involved a knowing misrepresentation under Section 512(f). ......... 10

    C.       Dismissal of Section 512(f) claims based on fair uses at the pleading stage
               could open the floodgates to private censorship. .................................................... 11

CONCLUSION .................................................................................................................. 13

# TABLE OF AUTHORITIES

## Federal Cases

*Am. Can Co. v. Mansukhani*,
   742 F.2d 314 (7th Cir.1984) ........................................................................... 5

*Assoc. of Am. Med. Colleges v. Cuomo*,
   928 F.2d 519 (2d Cir. 1991)............................................................................ 8

*Batzel v. Smith*,
   333 F.3d 1018 (9th Cir. 2003) ....................................................................... 5

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007).................................................................................... 10

*Campbell v. Acuff-Rose Music, Inc.*,
   510 U.S. 569 (1994).................................................................................... 11

*Clark v. Martinez*,
   543 U.S. 371 (2005).................................................................................... 11

*Does 1-4 v. Arnett*,
   No. SACV-12-96, 2012 WL 3150934 (C.D. Cal. Aug. 1, 2012) .................................. 2, 8

*Eldred v. Ashcroft*,
   537 U.S. 186 (2003).................................................................................... 11

*Epic Games, Inc. v. Altmeyer*,
   08-CV-0764-MJR, 2008 WL 4853634 (S.D. Ill. Nov. 5, 2008)....................................... 5

*Lenz v. Universal Music Corp.*,
   5:07-CV-03783-JF, 2013 WL 271673 (N.D. Cal. Jan. 24, 2013) ("*Lenz II*") ................... 7

*Lenz v. Universal Music Corp.*,
   572 F. Supp. 2d 1150 (N.D. Cal. 2008) ("*Lenz I*") ................................................ *passim*

*McCloskey v. Mueller*,
   446 F.3d 262 (1st Cir. 2006) ........................................................................ 11

*Online Policy Group v. Diebold, Inc.*,
   337 F. Supp. 2d 1195 (N.D. Cal. 2004) ......................................................... 6, 8, 9, 10

*Ouellette v. Viacom Int'l, Inc.*,
   No. CV-10-133, 2012 WL 850921 (D. Mont. March 13, 2012)................................. 2, 8, 9

*Penelope v. Brown*,
    792 F.Supp. 132 (D. Mass. 1992) ................................................................................. 8

*Perfect 10 v. CCBill*,
    488 F.3d 1102 (9th Cir. 2007) ................................................................................... 5

*Project Dod, Inc. v. Federici*,
    No. Civ. 09-213-P-H, 2010 WL 559115 (D. Me. Feb. 11, 2010)...................................... 8

*Rossi v. Motion Picture Ass'n of Am.*,
    391 F.3d 1000 (9th Cir. 2001) ................................................................................... 7

*Shropshire v. Canning*,
    809 F. Supp. 2d 1139 (N.D. Cal. 2011) ................................................................... 2, 8

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984).................................................................................................. 8

## Federal Statutes

17 U.S.C. § 106 ......................................................................................................... 8

17 U.S.C. § 107 ..................................................................................................... 2, 8

17 U.S.C. § 512 .................................................................................................. *passim*

17 U.S.C. § 512(c) ............................................................................................. *passim*

17 U.S.C. § 512(f) ............................................................................................. *passim*

17 U.S.C. § 512(g) ................................................................................................. 12

Digital Millennium Copyright Act of 1998 ("DMCA"),
    Pub. L. No. 105-304, 112 Stat. 2860 (Oct. 28, 1998).............................................. *passim*

## Federal Rules

Federal Rule of Civil Procedure 12(b)(6) ............................................................ 10, 11

Federal Rule of Civil Procedure 65(b)...................................................................... 5

Federal Rule of Evidence 801(d)(2)(D) ................................................................. 10

**Constitutional Provisions**

U.S. Const., amend. I ................................................................................................ 5, 11

**Legislative Materials**

S. Rep. 105-190 (1998) ........................................................................................... 1, 4, 12

**Other Authorities**

Copyright Removal Requests, Google Transparency Report ........................................ 6

Cory Doctorow, *UK website taken down by spurious copyright complaint regarding UK ultra-right groups* (Oct 10, 2012) ............................................................................. 6

Landmark Education and the Internet Archive, Electronic Frontier Foundation ........................ 12

*Malkin v. Universal*, Electronic Frontier Foundation .................................................. 12

Mike Masnick, *DMCA As Censorship: Citibank Doesn't Want You To Remember What It Said About Obama's Bank Reform Policy* ................................................................. 6

Mike Masnick, *Makers of Firefly 'Fan-game' Abuse DMCA To Try To Silence Critic*, techdirt (Feb. 21, 2013) ............................................................................................... 6

*MoveOn, Brave New Films v. Viacom*, Electronic Frontier Foundation ....................................... 12

Daniel Nazer, *How Copyright Law Censors Campaigns* (Jul. 19, 2012) .................................... 13

Kurt Opsahl, *Copyright Abuse in Ohio Governor Election* (Oct. 7, 2010) ................................. 13

*Sapient v. Geller*, Electronic Frontier Foundation ....................................................... 12

Michael Zhang, *GoPro Uses DMCA to Take Down Article Comparing Its Camera with Rival*, PetaPixel (Mar. 30, 2013) ....................................................................................... 6

## INTRODUCTION

*Amici curiae* Electronic Frontier Foundation ("EFF") and Digital Media Law Project ("DMLP") file this brief because this case raises an issue of crucial importance to Internet users: whether Section 512(f) of the Digital Millennium Copyright Act[1] ("DMCA") provides an effective deterrent against abuse of the DMCA's streamlined notice and takedown process.

The DMCA embodies a grand bargain. Copyright owners are given an expedited, non-judicial process for addressing online copyright infringement. In return, service providers who respond expeditiously to takedown notices are protected from secondary liability for material their users post online. As it crafted the bargain, however, Congress recognized that it needed to balance "the need for rapid response to potential infringement" with Internet users' "*legitimate interests in not having material removed without recourse.*" S. Rep. 105-190, at 21 (1998) (emphasis added). For this reason, Section 512 also provides that

> [a]ny person who knowingly materially misrepresents under this section . . . that material or activity is infringing . . . shall be liable for any damages, including costs and attorneys' fees, incurred by the alleged infringer . . . as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing . . . .

17 U.S.C. § 512(f). Section 512(f) "is intended to deter knowingly false allegations to service providers in recognition that such misrepresentations are detrimental to . . . Internet users." S. Rep. 105-190 at 49.

On the facts alleged, it appears that this case involves exactly the kind of DMCA abuse Section 512(f) was meant to deter. This is not a case about the tone of debate in the parties' blogs

---

[1] Digital Millennium Copyright Act of 1998 ("DMCA"), Pub. L. No. 105-304, 112 Stat. 2860 (Oct. 28, 1998); *see generally* U.S. Copyright Office Summary, The Digital Millennium Copyright Act of 1998, *available at* http://www.copyright.gov/legislation/dmca.pdf.

or about the merits of their respective views about childbirth. This is a case about defendant Crosley-Corcoran's alleged use of the DMCA's takedown procedure to silence a critic.

Nonetheless, the Court has stated that it "seriously questions" whether Tuteur has pled a viable misrepresentation claim pursuant to Section 512(f) of the DMCA. Order on Motion to Dismiss for Lack of Personal Jurisdiction at 5 (ECF No. 30). At its root, the Court's concern appears founded on the fact that fair use is an affirmative defense. *See id.* In its preliminary order, the Court suggested that there is "no requirement in the DMCA that a notice-giver inform the service provider of an infringer's possible affirmative defenses" because it only requires the owner to affirm that "the copyrighted material is being used without her (or her agent's) permission." *Id.*

EFF and DMLP welcome the Court's call for briefing on this important matter and respectfully suggest that the Court's preliminary analysis of the DMCA was incorrect. Several courts that have considered the question agree that Section 512(f) liability can, in appropriate circumstances, be based on a misrepresentation that a fair use is infringing. *Lenz v. Universal Music Corp.*, 572 F. Supp. 2d 1150, 1154-55 (N.D. Cal. 2008) ("*Lenz I*"); *accord. Does 1-4 v. Arnett*, No. SACV-12-96, 2012 WL 3150934 at *3 (C.D. Cal. Aug. 1, 2012); *Ouellette v. Viacom Int'l, Inc.,* No. CV-10-133, 2012 WL 850921 at *3-4 (D. Mont. March 13, 2012); *Shropshire v. Canning*, 809 F. Supp. 2d 1139, 1148 n.3 (N.D. Cal. 2011). The DMCA requires the copyright owner issuing a takedown notice to affirm that she has a "good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, *or the law*." 17 U.S.C. § 512(c)(3)(A)(v) (emphasis added). "The fair use of a copyrighted work . . . is not an infringement of copyright," 17 U.S.C. § 107. An allegation that a copyright owner issued a takedown notice knowing that the use in question was in fact authorized by law, and/or that she

had not formed a good faith belief to the contrary is, therefore, sufficient to state a claim under Section 512(f). *Lenz I*, 572 F. Supp. 2d at 1154-55.

Tuteur's January 25, 2013 complaint (the "Complaint") easily satisfies this standard. Tuteur alleges facts that, if accepted as true along with the plausible inferences they support (as they must be at this stage of the litigation), establish that Crosley-Corcoran sent at least one takedown notice knowing that Tuteur's use was a lawful fair use. *See* Complaint ¶¶ 42, 44, 46-48 (ECF No. 1).

By contrast, a ruling dismissing Tuteur's Section 512(f) claim on the merits could send a dangerous signal to copyright owners and Internet users that Section 512(f) offers scant protection for fair uses. Such an outcome would upset the careful balance struck by Congress between the rights of copyright owners, Internet service providers and users. *Amici* urge the Court to allow this matter to proceed on the merits.

## ARGUMENT

### A.    The DMCA was enacted to promote online innovation and free expression.

When Congress took up the issue of online copyright infringement in the mid-1990s, it sought to resolve a difficult challenge:  how to allow copyright owners to quickly and efficiently police online infringement without impairing lawful uses of copyrighted works or unfairly penalizing service providers for the actions of their users. Its answer was Section 512's "notice and takedown" provisions. Those provisions created "safe harbors" for service providers who meet certain requirements, including responding expeditiously to takedown notices sent by copyright owners. Copyright owners, for their part, were given an expedited, extra-judicial takedown procedure, together with explicit statutory guidance regarding the information that

must be provided in an "effective" takedown notice to take advantage of this procedure. *See* 17 U.S.C. § 512(c)(3)(A).

Any takedown notice must contain a "statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law." 17 U.S.C. § 512(c)(3)(A)(v). In addition, the copyright owner must state, under the penalty of perjury, that the information in the notification is accurate. 17 U.S.C. § 512(c)(3)(A)(vi). Only if the copyright owner's notice complied with those requirements (and the others set forth in Section 512(c)(3)(A)) could the service provider face liability for the user's infringement if it did not remove the content in question.

To ensure that this expedited process was not abused, Congress also included a deterrent, Section 512(f), that allows lawful users of copyrighted works to hold copyright owners accountable if they send a takedown notice without properly considering whether the use was in fact authorized by the copyright owner or the law. As the Senate Report on Section 512(f) explained,

> The Committee was acutely concerned that it provide all end-users . . . with appropriate procedural protections to ensure that material is not disabled without proper justification. The provisions in the bill balance the need for rapid response to potential infringement with the end-users legitimate interests in not having material re-moved without recourse.

S. Rep. No. 105-190 at 21 (1998).

Numerous courts have recognized the harm to free speech that could be caused by indiscriminate takedowns under Section 512, and the importance of mitigating that harm by requiring copyright owners to take the notice requirements seriously. Admonishing one copyright owner for its failure to send a compliant notice, for example, the Ninth Circuit Court of Appeals noted:

> The DMCA requires a complainant to declare, under penalty of perjury, that he is authorized to represent the copyright holder, and that he has a good-faith belief that the use is infringing. This requirement is not superfluous. Accusations of alleged infringement have drastic consequences: A user could have content removed, or may have his access terminated entirely. If the content infringes, justice has been done. But if it does not, speech protected under the First Amendment could be removed. We therefore do not require a service provider to start potentially invasive proceedings if the complainant is unwilling to state under penalty of perjury that he is an authorized representative of the copyright owner, and that he has a good-faith belief that the material is unlicensed.

*Perfect 10 v. CCBill*, 488 F.3d 1102, 1112 (9th Cir. 2007). Thus, Section 512(f) was crucial to accomplishing the DMCA's goal of "carefully balanc[ing] the First Amendment rights of users with the rights of a potentially injured copyright holder." *Batzel v. Smith,* 333 F.3d 1018, 1031 n.19 (9th Cir. 2003) (dictum).

By way of comparison, consider the procedure copyright owners might have used before the DMCA was enacted: a temporary restraining order under Federal Rule of Civil Procedure 65(b). *See, e.g., Epic Games, Inc. v. Altmeyer*, 08-CV-0764-MJR, 2008 WL 4853634, at *3 (S.D. Ill. Nov. 5, 2008). A TRO granted before the opposing party has an opportunity to be heard is subject to "stringent restrictions," acknowledging that "our entire jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted both sides of a dispute." *Id.* at *5 (quoting *Am. Can Co. v. Mansukhani,* 742 F.2d 314, 321 (7th Cir.1984)).

Like a temporary restraining order, DMCA takedowns under Section 512(c) can result in expressive material being taken down from the Internet sites through which they are communicated, without prior notice to the person who posted the material or a prior opportunity to contest the removal. Unlike a TRO, however, DMCA takedowns can occur, and are indeed expected to occur, without any prior judicial scrutiny. This makes the DMCA a tempting tool for those who wish to quickly silence a critic. Indeed, this not just a hypothetical concern: attacks on

lawful speech through Section 512 misuse are a real and growing problem. There are numerous, well-documented examples of individuals and corporations misusing DMCA takedown notices to remove lawful speech that they happen to dislike.[2] To take just one example of many, a United Kingdom man criticized in a blog post sent a DMCA takedown notice—and thereby successfully removed the speech—based solely on a 16-word quote. *See* Cory Doctorow, *UK website taken down by spurious copyright complaint regarding UK ultra-right groups* (Oct 10, 2012), http://boingboing.net/2012/10/10/uk-website-taken-down-by-spuri.html.

With the volume of DMCA takedown notices increasing every year, these issues are becoming even more important. In the week of March 5, 2013, Google alone received over four million notices, a ten-fold increase over the previous year. Copyright Removal Requests, Google Transparency Report, https://www.google.com/transparencyreport/removals/copyright/. If even a small percentage of DMCA takedown notices are improper, then thousands of persons will have their lawful speech censored. Congress enacted Section 512(f) precisely to prevent such abuse and help compensate for the lack of prior judicial approval to protect the "end-users legitimate interests." *See Lenz I*, 572 F. Supp. 2d at 1155; *see also Online Policy Group v. Diebold, Inc.*, 337 F. Supp. 2d 1195, 1204-05 (N.D. Cal. 2004).

---

[2] *See, e.g.*, Michael Zhang, *GoPro Uses DMCA to Take Down Article Comparing Its Camera with Rival*, PetaPixel (Mar. 30, 2013), http://petapixel.com/2013/03/20/gopro-uses-dmca-to-take-down-article-comparing-its-camera-with-rival; Mike Masnick, *Makers of Firefly 'Fan-game' Abuse DMCA To Try To Silence Critic*, techdirt (Feb. 21, 2013), http://www.techdirt.com/articles/20130221/00483422045/makers-firefly-fan-game-abuse-dmca-to-try-to-silence-critic.shtml; Mike Masnick, *DMCA As Censorship: Citibank Doesn't Want You To Remember What It Said About Obama's Bank Reform Policy*, techdirt (Sept. 27, 2010), http://www.techdirt.com/articles/20100926/18190711169/dmca-as-censorship-citibank-doesn-t-want-you-to-remember-what-it-said-about-obama-s-bank-reform-policy.shtml.

**B.     Tuteur's Complaint states a claim under Section 512(f), because it alleges that Crosley-Corcoran knowingly misrepresented in her takedown notices that had a good faith belief that Tuteur's use was "not authorized by . . . the law."**

The question of whether a party may state a Section 512(f) claim based on a lawful fair use has been addressed in the affirmative by multiple courts. This Court should follow suit.

### 1.     Section 512(f) imposes liability for knowing misrepresentations regarding uses authorized by law – including fair uses

Section 512(f) imposes liability on "[a]ny person who knowingly materially misrepresents under this section [(*i.e.*, under Section 512)] . . . that material or activity is infringing." 17 U.S.C. § 512(f). The mechanism by which a copyright owner represents that material or activity is infringing "under this section" is by invoking Section 512(c)(3)'s notice-and-takedown process. *See* 17 U.S.C. § 512(c)(3)(A). That provision requires a statement that "the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law." 17 U.S.C. § 512(c)(3)(A)(v). These two sections are linked; "both [the statute and the applicable case law] frame the [Section 512(f)] inquiry in terms of whether the party that issued the takedown notice had a 'good faith belief' that use of the copyrighted work was unauthorized." *Lenz v. Universal Music Corp.*, 5:07-CV-03783-JF, 2013 WL 271673 *7 (N.D. Cal. Jan. 24, 2013) ("*Lenz II*") (citing 17 U.S.C. § 512(c)(3)(A)(v) and *Rossi v. Motion Picture Ass'n of Am.*, 391 F.3d 1000, 1004 (9th Cir. 2001)).

Thus, Section 512 explicitly requires copyright owners to form a good faith belief that the material in question is not authorized *by law* (not just that it is not authorized by the copyright owner or his agent) before putting the DMCA's powerful takedown machinery into play, 17 U.S.C. § 512(c)(3)(A)(v).  As the Copyright Act unambiguously provides "the fair use of a copyrighted work . . . is *not* an infringement of copyright" *i.e.*, it is a use "authorized by law."

7

17 U.S.C. § 107 (emphasis added); *accord. Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 447 (1984); *Penelope v. Brown*, 792 F.Supp. 132, 136 (D. Mass. 1992) ("The fair use of a copyrighted work is not an infringement of copyright."); *Diebold*, 337 F. Supp. 2d at 1200 ("[F]air use is not infringement of a copyright."); *see also Assoc. of Am. Med. Colleges v. Cuomo*, 928 F.2d 519, 523 (2d Cir. 1991) ("[i]t has long been recognized that certain unauthorized but 'fair' uses of copyrighted material do not constitute copyright infringement."). Because a fair use is never a violation of the rights identified in Section 106, a fair use is a non-infringing use whether or not the user files a counter-notice, or is herself sued and raises fair use as a defense. The affirmative defense is simply the procedural vehicle through which the question is raised in litigation.

It follows that copyright owner who sends a takedown notice lacking a good faith belief that a use is not authorized by law can be held liable under Section 512(f). *Lenz I*, 572 F. Supp. 2d at 1154-55; *see also Arnett*, 2012 WL 3150934 at *3 (citing *Lenz* favorably); *Ouellette*, 2012 WL 850921 at *3-4; *Shropshire*, 809 F. Supp. 2d at 1148 n.3 ("Fair use of a copyrighted work does not constitute copyright infringement, and in order to proceed under the DMCA, a copyright owner must evaluate whether the material made fair use of the copyright."); *cf. Project Dod, Inc. v. Federici*, No. Civ. 09-213-P-H, 2010 WL 559115 at *1 (D. Me. Feb. 11, 2010) ("§ 512(f) gives . . . a cause of action for damages that [a party] suffers caused by a misrepresentation about infringement."). Any other reading effectively erases the clear and unambiguous statutory language.

As noted, *Lenz v. Universal* is precisely on point. In that case, plaintiff Stephanie Lenz made a short home movie featuring her toddler son Holden dancing in her kitchen to (barely audible) music by the artist Prince. Excited to share this video (the "Holden Video") with her

family and friends, she posted the 29-second clip on an Internet video hosting site, YouTube.com. Four months later, the Holden Video disappeared from YouTube due to a copyright claim from Universal Music Publishing Group. Lenz sued Universal Music Group under Section 512(f). Universal moved to dismiss, arguing that the DMCA did not require copyright owners to consider fair use before sending a takedown notice. *Lenz I*, at 1154.

The court denied Universal's motion, ruling that "[e]ven if Universal is correct that fair use only excuses infringement, the fact remains that fair use is a lawful use of a copyright. Accordingly, in order for a copyright owner to proceed under the DMCA with 'a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law' [as required by 17 U.S.C. § 512(c)(3)(A)(v)], the owner must evaluate whether the material makes fair use of the copyright." *Id.* at 1154-55 (footnote omitted). Other courts have followed suit. *See, e.g., Ouellette*, 2012 WL 850921at *3 ("[I]n asserting its good faith belief of a copyright infringement under 17 U.S.C. § 512(c)(3)(A)(v), a copyright owner 'must evaluate whether the material makes fair use of the copyright'" (quoting *Lenz I*, 572 F. Supp. 2d at 1154)).

The same reasoning may be found in *Online Policy Group v. Diebold*. In that case, the parties agreed that the copyrighted works at issue were the email archives from Diebold's corporate email system and that the plaintiffs had posted them in their entirety on their web servers. *Diebold*, 337 F. Supp. 2d at 1198-99. At issue instead was whether the posting of those works was a fair use under the Copyright Act and, most importantly, whether Diebold knew or should have known that such postings were fair use when it sent its DMCA notice. *Id.* at 1204. The court held on summary judgment that Diebold had, in fact, violated Section 512(f) because it knew or should have known that the postings were fair. *Id.* The court observed that Diebold had

done precisely what Crosley-Corcoran has allegedly done here: used the DMCA takedown process "as a sword to suppress publication of embarrassing content rather than as a shield to protect its intellectual property." *Id.* at 1205.

> **2.** **Tuteur has sufficiently alleged that Crosley-Corcoran's takedown notice involved a knowing misrepresentation under Section 512(f).**

Taken as true, as they must be on a Rule 12(b)(6) motion to dismiss, the allegations of the Complaint set forth a cause of action under Section 512(f). The Complaint alleges that Crosley-Corcoran sent two takedown notices under Section 512 of the DMCA despite having "actual subjective knowledge" that Tuteur's use of the Finger Photograph "did not infringe any copyright," thereby "knowingly and materially misrepresenting" in each that she "had concluded that [Tuteur's use] was infringing." Complaint ¶ 67. The Complaint outlines two independent reasons why Tuteur's use of the Finger Photograph was not copyright infringement: first, that Tuteur's use was authorized by the copyright owner, Crosley-Corcoran herself, and second, that Tuteur's use was a fair use. Complaint ¶¶ 65-66; 25-27.

The facts pled in the Complaint plausibly establish a claim for relief sufficient to survive a motion to dismiss. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). Indeed, if the facts are taken as true, they establish that Crosley-Corcoran knew that Tuteur's use was fair and thus "authorized by law" when she sent at least one (if not both) of her takedown notices. According to the Complaint, Crosley-Corcoran sent two takedown notices, the second of which was received by the hosting service Daringhost on or about January 21, 2013—ten days after Crosley-Corcoran's own attorney told Tuteur's husband that it was "obvious that Crosley-Corcoran had no copyright claim against [Tuteur]." *See* Complaint ¶¶ 33, 42, 46 & Exhs. E. & I; *see also* Fed. R. Evid. 801(d)(2)(D) (statement of "made by the party's agent or employee on a matter within the scope of that relationship and while it existed" is admissible against the party).

The Complaint also alleges facts that, if proven, would allow a jury to find that Crosley-Corcoran issued DMCA notices not to protect her intellectual property, but to silence Tuteur's criticism. *See* Complaint ¶¶ 41, 59. *McCloskey v. Mueller*, 446 F.3d 262, 266 (1st Cir. 2006) (court must "indulg[e] all reasonable inferences" in favor of the plaintiff on a motion to dismiss).

Following the reasoning in *Lenz* and the conclusions of numerous sister courts, these allegations suffice to pass Rule 12(b)(6) scrutiny.

## C.    Dismissal of Section 512(f) claims based on fair uses at the pleading stage could open the floodgates to private censorship.

Dismissal of Tuteur's claim, particularly at this stage, would send a dangerous signal to copyright owners and end users that copyright owners need not actually consider whether a given use is authorized by law before sending a takedown. As the Supreme Court has stated, fair use is a critical "First Amendment safeguard" that helps ensure "copyright's limited monopolies [will remain] compatible with free speech principles." *Eldred v. Ashcroft*, 537 U.S. 186, 219-20 (2003). Fair use is particularly important where, as here, an individual wants to respond to a critic. This is because writers—whether they wish to criticize, parody, or praise the work of another—need to quote the original to make their point effectively. *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 580 (1994).

If a copyright owner is *not* required to consider fair use when sending a DMCA takedown notice, the DMCA becomes an easy tool for censoring internet criticism: any person quoted by a critic could get the critic's speech quickly removed from the Internet.[3] For example, an author

---

[3] This impact on free expression strongly militates against adopting any construction of the DMCA that allows takedown notices to be sent without consideration of fair use. When a court is choosing which of two plausible constructions of a statute to adopt, a court must consider the necessary consequences of its choice: if "one of them would raise a multitude of constitutional problems, the other should prevail." *Clark v. Martinez*, 543 U.S. 371, 380-81 (2005).

could cause the takedown of a negative book review simply on the basis of the quotation of a few words.[4] Such a reading cannot be reconciled with either the text or the policy of Section 512, which was intended to facilitate the growth of the Internet as a platform for free speech. *See* S. Rep. No. 105-190 at 21.

To be clear, the DMCA's counter-notification process under Section 512(g)—which enables the target of an improper takedown notice to seek restoration of the removed content—is not a sufficient remedy.[5] That provision allows for the *restoration* of materials that have been improperly taken down after a two-week waiting period.  Section 512(f), by contrast, is meant to prevent improper takedowns in the first place.  The distinction is crucial, because the improper removal of lawful speech is a harm in and of itself.  Moreover, "unnecessary removal of non-infringing material causes significant injury to the public where time-sensitive or controversial subjects are involved and the counter-notification remedy does not sufficiently address these harms." *Lenz I*, 572 F. Supp. 2d at 1156. For example, in the context of a political campaign, a

---

[4] Unfortunately, there are many real-world examples of DMCA takedown notices being abused to silence lawful commentary making fair use of the work being criticized. *See* Landmark Education and the Internet Archive, Electronic Frontier Foundation, http://www.eff.org/cases/landmark-and-internet-archive (controversial education foundation sent DMCA takedown against critical six-hour documentary that showed two pages of its manual for a few seconds); *Sapient v. Geller*, Electronic Frontier Foundation, http://www.eff.org/cases/sapient-v-geller (well-known spoon-bending paranormalist sent DMCA takedown against critical 15-minute documentary based on eight seconds of introductory footage infringed copyright); *MoveOn, Brave New Films v. Viacom*, Electronic Frontier Foundation, http://www.eff.org/cases/moveon-brave-new-films-v-viacom (Viacom sent DMCA takedown notice for parody of Colbert Report), *Malkin v. Universal*, Electronic Frontier Foundation, http://www.eff.org/deeplinks/2007/05/malkin-fights-back-against-copyright-law-misuse-universal-music-group (Universal sent DMCA notice for criticism of Akon using short clips of videos for purposes of criticism).

[5] The DMCA provides that a service provider cannot be held liable if it "replaces the removed material and ceases disabling access to it not less than 10, nor more than 14, business days following receipt of the counter notice if the target of a takedown notice responds with a counter-notification." 17 U.S.C § 512(g)(2)(C).

few days can crucial. *See* Daniel Nazer, *How Copyright Law Censors Campaigns* (Jul. 19, 2012), https://cyberlaw.stanford.edu/blog/2012/07/how-copyright-law-censors-campaigns (noting that improper DMCA takedown notices have targeted political campaign advertisements); Kurt Opsahl, *Copyright Abuse in Ohio Governor Election* (Oct. 7, 2010), https://www.eff.org/deeplinks/2010/10/copyright-abuse-ohio-governor-election. Section 512(f) prevents such interference with speech from becoming an epidemic.

An interpretation of the DMCA that did *not* require owners to consider fair use would be an open invitation to abuse. Indeed, if "copyright owners are immune from liability by virtue of ownership alone, then to a large extent Section 512(f) is superfluous." *Lenz I*, 572 F. Supp. 2d at 1154. This Court should follow the prior courts that have examined the issue and ensure that the DMCA continues to provide protections for free speech as well as the rights of copyright owners.

## CONCLUSION

For the foregoing reasons, EFF and DMLP respectfully urge this Court to allow this case to proceed on the merits.

<div style="margin-left: 40%">

Respectfully submitted,

/s/ Christopher T. Bavitz
Christopher T. Bavitz (BBO #672200)
cbavitz@cyber.law.harvard.edu
CYBERLAW CLINIC
Harvard Law School
Berkman Center for Internet & Society
23 Everett Street, 2nd Floor
Cambridge, MA 02138
Telephone:  (617) 495-7547
Facsimile: (617) 495-7641

*Counsel for Amici Curiae Electronic Frontier
Foundation and Digital Media Law Project*

</div>

Dated:  May 1, 2013

On the brief:

Daniel Nazer
daniel@eff.org
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, California 94109
Telephone: (415) 436-9333
Facsimile: (415) 436-9993

Jeffrey P. Hermes (BBO# 637952)
jhermes@cyber.law.harvard.edu
Andrew F. Sellars (BBO# 682690)
asellars@cyber.law.harvard.edu
DIGITAL MEDIA LAW PROJECT
Berkman Center for Internet & Society
23 Everett Street, 2nd Floor
Cambridge, MA 02138
Telephone:  (617) 495-7547
Facsimile: (617) 495-7641

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified in the Notice of Electronic Filing and paper or electronic copies will be delivered to those indicated as non-registered participants on May 1, 2013.

/s/ Christopher T. Bavitz
Christopher T. Bavitz (BBO# 672200)