UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 13-10159-RGS

AMY TUTEUR, M.D.

v.

GINA CROSLEY-CORCORAN

MEMORANDUM AND ORDER ON SHOW CAUSE RESPONSE
AND DEFENDANT'S MOTION TO DISMISS

September 10, 2013

STEARNS, D.J.

The choice of birthing techniques is not the most obvious  subject for a
war of polemics.  But the wisdom of midwifery triggered a ferocious battle of
the blogs culminating in this lawsuit pitting Amy Tuteur, a resident of
Massachusetts, and former physician, against defendant Gina Crosley-
Corcoran, a doula (midwife), and resident of Illinois.  Tuteur, who authors
several blogs, including *The Skeptical OB*[1], is a scathing critic of home birthing,
while Crosley-Corcoran, the author of the blog *TheFeministBreeder,* is a
proponent of "natural" birth.

After a particularly bitter internet exchange with Tuteur on December 13,

---

[1] Through the agency of *The Skeptical OB* blog, Tuteur seeks "to educate
the public on the well-established dangers of homebirth, [to] 'expose the lies
of self-proclaimed homebirth midwives, and . . . [to] protect babies who don't
have to die.'" Pl.'s Opp'n at 3, quoting Compl. ¶ 17.

2012, Crosley-Corcoran posted a photograph of herself on her blog in a graphic hand pose (*digitus impudicus*) underscored with a caption informing readers that she was giving Tuteur "something else to go back to her blog and obsess about."   Rising to the bait, Tuteur copied the photo and posted it on *The Skeptical OB,* without Crosley-Corcoran's explicit permission.

On December 16, 2012, Kim Bilbrey, an attorney for Crosley-Corcoran, sent a cease-and-desist notice by email to Tuteur alleging copyright infringement and demanding that Tuteur remove Crosley-Corcoran's photo from her blog.[2]  According to Bilbrey, she sent the notice by email because she "had no physical address for Ms. Tuteur, only an email address. [She] did not know that Ms. Tuteur was located in Massachusetts."  Bilbrey Aff. ¶ 6 - Dkt. #13-11.  Bilbrey also sent BlueHost, Tuteur's web server in Provo, Utah, a "takedown notice" pursuant to the Digital Millennium Copyright Act (DMCA), 17 U.S.C. § 512(c)(3).  On December 17, 2012, BlueHost warned Tuteur that "[f]ailure to eliminate or disable access to such alleged infringing material within [48 hours] could result in suspension or termination of your website."

---

[2] Tuteur claims that the caption placed by Crosley-Corcoran under the photo effectively gave her permission to publish it on her blog.  Crosley-Corcoran takes the position that the cease-and-desist email should have disabused Tuteur of any notion that she was acting with Crosley-Corcoran's permission.  Crosley-Corcoran Aff. ¶ 16 - Dkt. #13-10.

Compl. ¶ 37. Tuteur temporarily removed the photo, then thought better of the idea, and reposted it.  On December 22, 2012, Tuteur filed a counter notice with BlueHost protesting Crosley-Corcoran's claim of copyright infringement.[3] On January 18, 2013, BlueHost washed its hands of the snowballing disputation and notified Tuteur and Crosley-Corcoran that it was up to either or both of them "to pursue legal action."[4]  Dkt. #39-1.  Tuteur responded by shifting *The Skeptical OB* to a new Internet Service Provider (ISP), DaringHost, and restoring Crosley-Corcoran's photo.  Crosley-Corcoran rejoined by sending DaringHost a takedown notice.  DaringHost informed Tuteur of the takedown demand on January 21, 2013.  Tuteur submitted a counter notice, although she removed Crosley-Corcoran's photo from her website "to avoid further interruption of public access to *The Skeptical OB*."  Compl. ¶ 51.

While the blogs raged, Crosley-Corcoran's new counsel, Jake Marcus, reached out to Tuteur in an attempt to forge a truce.  Marcus received a

---

[3] Crosley-Corcoran argues that Tuteur's counter notice falsely states under oath that  she is "the owner [of the photograph] or is authorized to act on the owner's behalf . . . ."  Def.'s Resp. at 4 n.1.

[4] Tuteur states that BlueHost informed her that her "web hosting account for skepticalob.com ha[d] been deactivated as of 12/21/2012."  Pl.'s Reply Br. at 2.

response from Tuteur's husband, Michael Tuteur, the Chair of the Litigation Department at Foley & Lardner LLP, a large Boston law firm. Michael Tuteur told Marcus that while he was representing his wife, she was not a client of his firm. Marcus Aff. ¶¶ 5-8 - Dkt. #13-7. Marcus stated that Crosley-Corcoran would willingly walk away from the fight if Amy Tuteur would remove her picture from the website. Marcus also proposed that the two combatants agree to abstain from any future references to one another in their blogs.[5]  Spurning the offer, Tuteur filed this lawsuit on January 25, 2013.[6]

---

[5] On January 18, 2012, Crosley-Corcoran published a post on her blog titled, "On Negotiating with Terrorist Amy." In the post, she stated that Tuteur

> could owe me statutory damages, but because I'm a fair and reasonable human being, my attorney and I felt it was best to discuss a non-monetary settlement with Amy and her lawyer. I'm not looking to be greedy – I simply wanted a resolution.  In exchange for not pursuing the damages, we wanted Amy to agree to stop personally attacking me.  It was that simple.

Compl. ¶ 44.

[6] Amy Tuteur alleges that "Attorney Marcus conceded that it was obvious that Crosley-Corcoran had no copyright claim against [Tuteur] and that, as a result, he would not be pursuing any such claim."  Compl. ¶ 42.  Attorney Marcus recalls the discussion differently:

> To be clear, I never told Attorney Tuteur that I thought Ms. Crosley-Corcoran did not have a viable copyright claim nor did I tell him that this was the reason that I would not be representing her going forward. Indeed, I told him precisely the opposite – that I believed she did have a good copyright claim and that the only

In her two-count Complaint, Tuteur alleges that Crosley-Corcoran made a material misrepresentation of infringing activity in violation of 17 U.S.C. § 512(f).  She also alleges tortious interference by Crosley-Corcoran with the advantageous contractual relationships that she enjoyed with her ISPs.  Both counts hinge on the takedown notices sent by Crosley-Corcoran to BlueHost and DaringHost, notices that Tuteur alleges were animated by "improper motives and/or improper means."  Compl. ¶ 78.  Crosley-Corcoran, for her part, moves to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(2).  She maintains that as a resident of Illinois whose only connection to Massachusetts is the cease-and-desist email, she lacks the "minimum contacts" necessary to subject her to *in personam* jurisdiction in this forum.

On April 10, 2013, the court issued an Order directing Tuteur to show cause why her Complaint should not be dismissed on the merits or on jurisdictional grounds.  Tuteur filed her response on May 1, 2013.  That same

---

reason that I would not be representing Ms. Crosley-Corcoran if the matter ended up in Court is that the litigation would have to take place in Illinois, while I am located in Pennsylvania. . . . I was appalled because the words which Attorney Tuteur has attributed to me are almost entirely fabricated.

Marcus Aff. ¶¶ 11-12.

day, the Electronic Frontier Foundation (EFF)[7] and the Digital Media Law Project (DMLP)[8] sought leave to file amici curiae briefs in partial support of Tuteur's Complaint.  Shortly after Crosley-Corcoran filed a response, the Motion Picture Association of America, Inc. (MPAA), asked to file an amicus brief. Leave to file the briefs was granted. The court heard oral argument from the parties and representatives of the amici on July 1, 2013.

Jurisdiction

"On a motion to dismiss for want of personal jurisdiction, the plaintiff ultimately bears the burden of persuading the court that jurisdiction exists." *Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 8 (1st Cir. 2009). However, where, as here, "the district court's disposition as to the personal jurisdiction question is based on affidavits and other written materials in the absence of an evidentiary hearing, a plaintiff need only to make a prima facie showing that [the defendant is] subject to personal jurisdiction." *Elecs. for Imaging, Inc. v. Coyle*, 340 F.3d 1344, 1349 (Fed. Cir. 2003); *see also Phillips*

---

[7] EFF describes itself as a "nonprofit public interest organization dedicated to protecting civil liberties and free expression in the digital world." EFF's Mtn at 1 - Dkt. #35.

[8] DMLP states that it "provides legal assistance, training, and other resources for online citizen media . . . and advocates on behalf of those who gather and report news and information online and disseminate that news and information to the public via the Internet." *Id*. at 2.

*v. Prairie Eye Ctr.,* 530 F.3d 22, 26 (1st Cir. 2008) ("Because the district court did not hold an evidentiary hearing but credited the plaintiff's evidentiary submissions, we construe the court's ruling as employing the prima facie method.").  The court, in evaluating whether a plaintiff has met her burden, "must accept the uncontroverted allegations in the plaintiff's complaint as true and resolve any factual conflicts in the affidavits in the plaintiff's favor." *Elecs. for Imaging,* 340 F.3d at 1349.

Tuteur maintains that the court has specific personal jurisdiction over Crosley-Corcoran under section (a) of the Massachusetts Long-Arm Statute – the transacting business section – because: Crosley-Corcoran solicits legal fees on her blog; offers paid subscriptions to her blog; and sells items from her virtual midwifery store to customers in Massachusetts.[9]  Tuteur also more persuasively asserts jurisdiction under section (c) of the Long-Arm Statute, alleging that Crosley-Corcoran unleashed a tort – "a crusade for the express purpose of squelching [Tuteur's] speech" – the effects of which were felt by Tuteur in Massachusetts.   Pl.'s Mem. at 2; *see also* Compl. ¶¶ 52-62.[10]

---

[9] Tuteur offers nothing by way of documentary evidence to suggest that Crosley-Corcoran in fact maintains a business presence in Massachusetts.

[10] Under the Massachusetts Long-Arm Statute, "[a] court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's (a) transacting any

"The proper exercise of specific *in personam* jurisdiction hinges on satisfaction of two requirements:  first, that the forum in which the federal district court sits has a long-arm statute that purports to grant jurisdiction over the defendant; and second, that the exercise of jurisdiction pursuant to that statute comports with the strictures of the [Due Process Clause of the] Constitution." *Pritzker v. Yari*, 42 F.3d 53, 60 (1st Cir. 1994).  The Fourteenth Amendment's concern for fundamental fairness is encapsulated in the jurisdictional requirement that there be at least some "minimum contacts" between the defendant and the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

In judging minimum contacts, the Supreme Court has held that the "proper focus [is] on the relationship among the defendant, the forum, and the litigation." *Calder v. Jones*, 465 U.S. 783, 788 (1984), quoting *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977).[11]   The test has three parts.  The so-called

---

business in this commonwealth; . . . [or] (c) causing tortious injury by an act or omission in this commonwealth."  Mass. Gen. Laws ch.  223A, §§ 3(a) and (c).

[11] In her Opposition to Crosley-Corcoran's motion to dismiss, Tuteur relies heavily on the *Calder* decision.  In *Calder*, an editor and a writer for the National Enquirer, both of whom were residents of Florida, were sued in California for libeling Shirley Jones, a California actress.  *Id*. at 789-790.  The

"effects" test derived from *Calder* provides that "a defendant's tortious acts can serve as a source of personal jurisdiction only where the plaintiff makes a prima facie showing that the defendant's acts (1) were intentional, (2) were uniquely or expressly aimed at the forum state, and (3) caused harm, the brunt of which was suffered – and which the defendant knew was likely to be suffered – [in the forum state]."[11]  *Johnson v. Arden*, 614 F.3d 785, 796 (8th Cir. 2010), quoting *Lindgren v. GDT, LLC*, 312 F. Supp. 2d 1125, 1132 (S.D. Iowa 2004); *see also Astro-Med, Inc.*, 591 F.3d at 10.

For policy reasons, most jurisdictions have held that cease-and-desist letters – like those sent by Crosley-Corcoran's attorneys – absent additional purposeful acts directed to the contested forum, are inadequate to establish jurisdiction.  *See Avocent Huntsville Corp. v. Aten Int'l Co., Ltd.*, 552 F.3d

---

offending article involved Jones's California activities.  The story was drawn from California sources, and the brunt of the harm, in terms of emotional distress and injury to Jones's professional reputation, was felt in California. In upholding the exercise of personal jurisdiction over the two defendants, the Supreme Court pointed to the fact that the National Enquirer had its largest circulation – over 600,000 copies – in California.  *Id.* "[J]urisdiction properly could be asserted over the reporters because the defendants had aimed an act at the forum state, knew the act would likely have a devastating effect, and knew the injury would be felt in the forum state, where Jones lived and worked 'and in which the National Enquirer ha[d] its largest circulation.'" *Id.* at 790.

[11] It is undisputed that on December 22, 2012, Tuteur sent a counter notice under the DMCA to BlueHost revealing her Massachusetts residence.

1324, 1333 (Fed. Cir. 2008) (for the exercise of personal jurisdiction in an action for declaratory judgment in a patent action, to comport with fair play and substantial justice there must be activities directed at the forum besides letters threatening suit); *Beacon Enter., Inc. v. Menzies*, 715 F.2d 757, 762-763 (2d Cir. 1983) (cease-and-desist letter sent by a nonresident defendant to plaintiff in New York alleging that the latter's use of a trademark violated federal law did not constitute a "transaction of business" sufficient to support the exercise of long-arm jurisdiction); *Accessories Ltd. of Maine, Inc. v. Longchamp U.S.A.*, 170 F. Supp. 2d 12, 15 (D. Me. 2001) (in an infringement case, the sending of a cease-and-desist letter into a forum is generally not considered sufficient in and of itself to establish personal jurisdiction under the "effects test"); *Wise v. Lindamood*, 89 F. Supp. 2d 1187, 1192 (D. Colo. 1999) (same, setting out a majority of cases in accord).

The leading First Circuit case analyzing cease-and-desist letters through the lens of personal jurisdiction, *Nova Biomedical Corp. v. Moller*, 629 F.2d 190 (1st Cir. 1980), takes a more nuanced view.  It holds that the sending of a patent infringement letter threatening suit "can, in certain circumstances, constitute the transaction of business within the meaning of the Massachusetts' long arm statute," but "[w]hether a patentee is thereafter subject to jurisdiction will depend on whether he possesses sufficient contacts with the forum to

10

satisfy due process." *Id*. at 197; *see also GSI Lumonics, Inc. v. BioDiscovery, Inc*., 112 F. Supp. 2d 99, 110 (D. Mass. 2000).  In *Nova*, Judge Bownes found that prior to sending the cease-and-desist letter, the defendant was engaged in patent-related activity in Massachusetts, including the selling of products involving the patent-in-suit and the entering of a cross-licensing agreement with another Massachusetts corporation. The Court held that these additional patent-related activities in the forum sufficed to satisfy due process.  629 F.2d at  195.

   While under *Nova*, Crosley-Corcoran's cease-and-desist letter would by itself be insufficient to establish personal jurisdiction in Massachusetts, her invocation of the DMCA takedown process to improperly remove protected content from Tuteur's (a Massachusetts resident) website adds the element of "more" to the equation.  (I say "improper" not to prejudge the issue, but because I am obliged to accept the allegations of the Complaint in this respect as true.  *See Phillips,* 530 F.3d at 26, quoting *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A*., 290 F.3d 42, 51 (1st Cir. 2002) ("The court 'must accept the plaintiff's (properly documented) evidentiary proffers as true for the purpose of determining the adequacy of the prima facie jurisdictional showing, and construe them in the light most congenial to the plaintiff's jurisdictional claim.'")).  Tuteur alleges that Crosley-Corcoran

11

contacted the ISPs as part and parcel of a calculated campaign to silence her criticisms of Crosley-Corcoran's views about home birthing.[12]  Tuteur claims that Crosley-Corcoran's means to that end was to interfere with Tuteur's website by literally disconnecting Tuteur's ability to express her views.  While it appears that Crosley-Corcoran would have had reason to suspect that Tuteur

---

[12] Some legal commentators argue that because the takedown notice is directed not to the infringer, but rather to the ISP, it locates jurisdiction not in the infringer's forum, but in the forum where the ISP is located.  *Cf.* Andrew Cabasso, *Piercing Pennoyer with the Sword of a Thousand Truths: Jurisdictional Issues in the Virtual World,* 22 Fordham Intell. Prop. Media & Ent. L.J. 383, 430-431 (2012).  The few courts that have spoken on the subject disagree (notably those in venues where the mass volume internet sites – eBay, Google, Yahoo, YouTube, Facebook, etc. – are located). *See, e.g., Project DOD, Inc. v. Federici,* 2009 WL 4910320, at *8 (D. Me. Dec. 13, 2009) ("If plaintiff's theory of jurisdiction were upheld, then the Northern District of California could assert jurisdiction over every single takedown notice ever sent to YouTube or any other company in Silicon Valley. Citizens around the world – from Indonesia to Italy, Suriname to Siberia – could all be haled into court in the San Francisco Bay area, California, USA, for sending off a fax claiming that a video clip is infringing. Federal courts sitting in California could assert personal jurisdiction over foreign defendants in wholly foreign disputes. . . . Such broad jurisdiction, premised solely on the happenstance that many internet companies that are not even parties to 512(f) litigation have offices in Silicon Valley, is unreasonable."). *But see Doe v. Geller*, 533 F. Supp. 2d 996, 1010 (N.D. Cal. 2008) ("The court acknowledges that internet users . . . will not always be able to establish jurisdiction in their home states (or in the United States) over defendants in § 512(f) cases. The sender of a takedown notice may not know where the target of the takedown notice lives, and therefore the sender does not purposefully direct his actions at any specific individual state. Hence, in some cases, California (the state to which the takedown notice is sent) might be the only plausible state in which to bring a § 512(f) claim over a foreign defendant.").

resided in Massachusetts in February of 2011 – when Crosley-Corcoran asked on her Facebook page if anyone knew where Tuteur lived, blogee Chic Robertson responded that "the white pages confirms an Amy Tuteur living in Sharon, MA – by the time that she issued the second takedown notice, Crosley-Corcoran had definite confirmation of Tuteur's Massachusetts domicile.[13]

The case most firmly advocating for jurisdiction under the tortious prong of the Massachusetts Long-Arm Statute is *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063 (10th Cir. 2008). In *Dudnikov*, the court found that a British company's refusal to remove a Notice of Claimed Infringement (NOCI) after the Colorado plaintiffs agreed to desist selling infringing fabric on eBay affirmatively interfered with plaintiffs' business, thus vesting jurisdiction in the Colorado courts.[14] By wrongfully serving a takedown notice

---

[13] Pertinently, section 512 provides that the alleged infringer must include in the counter notification the "subscriber's name, address, and telephone number, and a statement that the subscriber consents to the jurisdiction of [the] Federal District Court for the judicial district in which the address [of the subscriber] is located." 17 U.S.C. § 512(g)(3)(D). The copyright holder learns of the alleged infringer's domicile once the holder receives a copy of the counter notification. *See* 17 U.S.C. § 512(g)(2)(B).

[14] In *Dudnikov*, a couple operating an unincorporated Internet-based business from their Colorado home filed suit against SevenArts, a British corporation. SevenArts had notified eBay that the couple was selling fabric that infringed on a design of the artist known as Erté. In Erté's original works, Symphony In Black and Ebony On White, a tall, slender woman is pictured wearing a floor length form-fitting dress that trails her feet, and holding the

on a resident of Massachusetts, Crosley-Corcoran "purposefully and voluntarily direct[ed] [her] activities toward the forum so that [she] should expect, by virtue of the benefit [she] receive[d], to be subject to the court's jurisdiction based on these contacts." *Id*. at 624.

Takedown Notices

---

leash of a thin, regal dog. The fabric offered for sale by the wife and husband – Karen Dudnikov and Michael Meadors – replaced the  elegant woman in Erté's images with Betty Boop, and her cartoon pet, Pudgy.  SevenArts sent eBay a NOCI, and eBay closed down the couple's auction.  Dudnikov offered to remove the fabric from sale, but asked SevenArts to withdraw the NOCI as the notice affected plaintiffs' eBay rating. When SevenArts declined, plaintiffs filed a declaratory action in Colorado.  SevenArts moved to dismiss for lack of personal jurisdiction.

The Tenth Circuit found that

[d]efendants did not merely inform plaintiffs of their rights and invite settlement discussions prior to potential litigation, but took affirmative steps with third parties that suspended plaintiffs' ongoing business operations. And under eBay's procedures, plaintiffs' only recourse, other than capitulation, was litigation. In such circumstances, we cannot say that requiring defendants to answer for their actions in Colorado is unfair.  Defendants sent a NOCI to eBay expressly intending (and effectually acting) to suspend plaintiffs' auction in Colorado. Plaintiffs' suit arises from, and is indeed an effort to reverse, the intended consequences of defendants' NOCI which they incurred in Colorado. For purposes of this motion, moreover, we must assume defendants knew plaintiffs' business was located in Colorado. And defendants point us to no basis in traditional notions of fair play or substantial justice that would preclude suit in that forum.

*Id*. at 1082.

14

Section 512 of the DMCA expressly limits the liability of an ISP for copyright infringement by its subscribers.  In adopting section 512, Congress intended to craft a mechanism that would "balance the need for rapid response to potential infringement with the end-users [sic] [the alleged infringers] legitimate interests in not having material removed without recourse."  S. Rep. 105-190, at 21 (1998).  The mechanism works as follows.  A party with a good faith belief that posted material infringes a copyright in which he or she (or it) has an ownership interest, may file an extrajudicial "takedown" notice with the ISP.  The notice must contain the elements listed in section 512(c)(3), among them the identification of the copyrighted work and the infringing material. The copyright owner must also affirm that she has a "good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law," and that the information contained in the notice is accurate.  Section 512(c)(3)(A)(v)&(vi).  Upon receiving a takedown notice, the ISP must remove the allegedly infringing material or disable access to it. *Id*. *See generally* Frederick W. Mostert, Martin B. Schwimmer*, Notice and Takedown for Trademarks,* 101 TMR 249 (2011). Additionally, the ISP must notify the subscriber of the removal.   17 U.S.C. § 512(g)(2)(A).

As an antidote for potential abuse of the expedited takedown procedure,

Congress included a counter-notification provision, 17 U.S.C. § 512(g)(3), that permits the accused infringer to file an objection with the ISP and, more to the immediate point, imposes liability on "[a]ny person who knowingly and materially misrepresents under this section . . . that material or activity is infringing." *Id*. Congress intended the statutory counter-notification and "put-back" procedures to give protection to "third parties' interests in ensuring that material not be taken down." H.R. Rep. 105-551 (II), at 59 (1998). Upon receipt of a counter notification, the ISP must forward a copy to the copyright holder and inform her "that it will replace the removed material or cease disabling access to it in 10 business days." 17 U.S.C. § 512(g)(2)(B). The ISP must then repost the material online, unless it receives notice that the copyright holder has filed for a restraining order with a court of competent jurisdiction. *See* 17 U.S.C. § 512(g)(2)(C).[15]

---

[15] EFF makes the valid point that even a two-week improper removal of lawful speech from the public domain "'causes significant injury . . . where time-sensitive or controversial subjects are involved and the counter-notification remedy does not sufficiently address these harms.' . . . For example, in the context of a political campaign, a few days can [be] crucial." EFF/DMLP Brief at 12-13, quoting *Lenz v. Universal Music Corp.*, 572 F. Supp. 2d 1150, 1156 (N.D. Cal. 2008). The irony of the comparison between speech in service of political discourse and personal invective of the kind at issue here is not lost on the court. Nonetheless, short of obscenity, threats, and fighting words, and some forms of commercial speech, there is no First Amendment hierarchy that accords greater worthiness to some forms of speech over others.

In support of her motion to dismiss, Crosley-Corcoran states that prior to sending the takedown notices she sought the advice and assistance of two attorneys – Bilbrey and Marcus – each of whom has submitted a supporting affidavit. Bilbrey (who represented Crosley-Corcoran briefly at the beginning of this dispute), states that she helped Crosley-Corcoran draft the original cease-and-desist letter sent to Tuteur. Bilbrey Aff. ¶ 5. Crosley-Corcoran's second attorney, Marcus, states that he considered – and rejected – Tuteur's argument that her posting of the ignominious photo constituted "fair use." Marcus Aff. ¶ 7. Crosley-Corcoran, for her part, states that she "believed then, and believes now that this was a completely legitimate, legal, and appropriate use of a DMCA takedown notice." Crosley-Corcoran Aff. ¶ 18.[16]

---

[16] Tuteur objects to the court's consideration of the affidavits of the attorneys (or of Crosley-Corcoran) in deciding the motion to dismiss, arguing that any reliance on material outside the four corners of the Complaint (other than public documents or documents not in dispute) impermissibly converts the motion to dismiss into one for summary judgment. Rule 12(d) requires that a district court provide the parties with notice of its intention to convert a motion to dismiss so that the previous filings can be augmented by both parties. The court did not give (or intend) such notice. The Complaint alleges that Tuteur's counsel (her husband) had a January 10, 2013 conversation with Marcus in which Marcus "conceded that it was obvious that Crosley-Corcoran had no copyright claim against Dr. Amy." Compl. ¶ 42. Marcus adamantly denies the assertion. Marcus Aff. ¶ 12. This dispute of material fact, in any event, would be sufficient to defeat a brevis dismissal. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (a court may not disregard properly pled factual allegations, "even if it strikes a savvy judge that actual proof of those facts is improbable."). If the Marcus allegation has been inserted into the

The issue boils down to the proper test of what is required of a copyright owner prior to the filing of a takedown notice.  Tuteur and amici EFF/DMLP advocate requiring the copyright owner to investigate any possibly applicable fair use or other affirmative defense that the alleged infringer might have before filing the notice.  Crosley-Corcoran and amicus MPAA would condition liability under section 512(f) on proof of a copyright owner's actual, subjective belief that he or she is making a material misrepresentation of infringement. *See* Dkt. #34 at 8-11; EFF/DMLP Br. at 7-10 - Dkt. #35-1.

The case most closely in point is *Rossi v. Motion Picture Ass'n of Am., Inc.*, 391 F.3d 1000 (9th Cir. 2004).  Plaintiff  Rossi operated a website that advertised "Full Length Downloadable Movies" and posted graphics for copyrighted movies.  Invoking the DMCA, the defendant MPAA sent notices of infringing conduct to Rossi and his ISP.  Rossi sued the MPAA for tortious interference with advantageous contractual relations.  *Id*. at 1002.  Rossi argued that under any objective standard, the MPAA could not have formed a "good faith belief" that his site was distributing infringing material because "a reasonable investigation" would have revealed that users could not download movies from the site.  *Id*. at 1003.  The Ninth Circuit rejected Rossi's reading

_____

Complaint as a bad faith prophylactic to avert a summary disposition, Rule 11 provides at the appropriate time, the appropriate remedies.

of the statute.  The Court of Appeals held that the "interpretive case law and the statutory structure [of the DMCA] support the conclusion that the 'good faith belief' requirement in § 512(c)(3)(A)(v) encompasses a *subjective, rather than objective, standard*." *Id*. at 1004 (emphasis added).

> In § 512(f), Congress included an expressly limited cause of action for improper infringement notifications, imposing liability only if the copyright owner's notification is a knowing misrepresentation. A copyright owner cannot be liable simply because an unknowing mistake is made, even if the copyright owner acted unreasonably in making the mistake. Rather, there must be a demonstration of some actual knowledge of misrepresentation on the part of the copyright owner.

*Id*. at 1004-1005.  The Ninth Circuit specifically rejected the imposition of an "objective standard of review for gauging the reasonableness" of a copyright owner's "conduct in notifying" parties of an "allegedly infringing website." *Id*. at 1004; *see also Cabell v. Zimmerman,* 2010 WL 996007, at *4-5 (S.D.N.Y. Mar. 12, 2010) (adopting *Rossi*); *Third Educ. Group, Inc. v. Phelps*, 675 F. Supp. 2d 916, 927 (E.D. Wis. 2009) (same); *UMG Recordings, Inc. v. Augusto*, 558 F. Supp. 2d 1055, 1065 (C.D. Cal. 2008), aff'd on other grounds, *UMG Recordings, Inc. v. Augusto*, 628 F.3d 1175 (9th Cir. 2011) (same); *Dudnikov v. MGA Entm't, Inc*., 410 F. Supp. 2d 1010, 1013 (D. Colo. 2005) (same).

In its brief, the MPAA makes the persuasive point that

there are sound structural and policy reasons to believe Congress did not intend the DMCA to require that every takedown notice be preceded by a consideration of the possible applicability of fair use, upon penalty of a suit under § 512(f) if such an inquiry is not made. As an affirmative defense, fair use serves to excuse a use that otherwise is infringing, not to create an affirmative right of use. Moreover, fair use requires an equitable balancing of multiple factors, including four factors set out in the text of Section 107. The Supreme Court has emphasized that the fair use analysis does not lend itself to "bright-line rules, for the statute, like the doctrine it recognizes, calls for case-by-case analysis."*Campbell* [*v. Acuff-Rose Music, Inc.*], 510 U.S. 569, 577 [(1994)].

MPAA Br. at 8.

Tuteur, along with the EFF and DMLP, argue that a consideration of fair use is required to give meaning to the owner's declaration that the appropriation of the copyrighted material is not "authorized by the copyright owner, its agent, *or the law*." 17 U.S.C. § 512(c)(3)(A)(v) (emphasis added). The argument relies almost exclusively on a district court's order denying a motion to dismiss in *Lenz v. Universal Music Corp.*, 572 F. Supp. 2d 1150 (N.D. Cal. 2008). In *Lenz*, the plaintiff mother made a short home movie featuring her toddler son dancing in her kitchen to music by the artist Prince. The mother posted the 29-second clip on an Internet video hosting site, YouTube.com. Several months later, Universal Music Publishing Group notified YouTube that it owned the copyright on the musical score. YouTube took down the video and Lenz sued Universal Music Group under section

512(f).  Universal moved to dismiss.  The court denied Universal's motion,
ruling that "[e]ven if Universal is correct that fair use only excuses
infringement, the fact remains that fair use is a lawful use of a copyright.
Accordingly, in order for a copyright owner to proceed under the DMCA with
'a good faith belief that use of the material in the manner complained of is not
authorized by the copyright owner, its agent, or the law' [as required by 17
U.S.C. § 512(c)(3)(A)(v)], the owner must evaluate whether the material makes
fair use of the copyright." *Id*. at 1154-1155.

*Lenz*, a district court opinion, has far less traction than the Ninth
Circuit's opinion in *Rossi*.  As the MPAA points out, in its most recent iteration
(denying cross-motions for summary judgment), the *Lenz* court substantially
retreated from its earlier ruling, acknowledging that "in light of *Rossi,*" the
"mere failure to consider fair use *would be insufficient* to give rise to liability
under § 512(f), and that a plaintiff must show that the defendant "had some
actual knowledge that its Takedown Notice contained a material
misrepresentation."   *Lenz v. Universal Music Corp*., 2013 WL 271673, at *6
(N.D. Cal. Jan. 24, 2013) (*Lenz II*).[17]

---

[17] While not a DMCA case, the Ninth Circuit's discussion of fair use in
*Monge v. Maya Magazines, Inc*., 688 F.3d 1164 (9th Cir. 2012), makes the
point that "[t]his affirmative defense presumes that unauthorized copying has
occurred, and is [ ] aimed at whether the defendant's use was fair."  *Id*. at 1170.

More compelling is the fact that, in enacting the DMCA, Congress did not require that a notice-giver verify that he or she had explored an alleged infringer's possible affirmative defenses prior to acting, only that she affirm a good faith belief that the copyrighted material is being used without her or her agent's permission.[18] *See* 17 U.S.C. §§ 512(f) and 512(c)(3)(A)(v). There is a reason for this. To have required more would have put the takedown procedure at odds with Congress's express intent of creating an "expeditious[]," "rapid response" to "potential infringement" on the Internet. *See* 17 U.S.C. § 512(c)(1)(A)(iii); S. Rep. 105-190, at 21. Undoubtedly abuses will occur - as is the case with almost any system that permits legal self-help (although EFF and DMLP point to but a handful of examples). For these abuses Congress provided a remedy in section 512(f). If experience ultimately proves that the remedy is weighted too heavily in favor of copyright owners at the expense of those who seek to make "fair use" of another's intellectual property, the

---

Citing *Monge,* Universal made the logical argument in *Lenz II* that because a fair use analysis is only undertaken after unauthorized copying, "by definition fair use cannot be an 'authorized' use for purposes of the DMCA." *Lenz II*, 2103 WL 271673, at *5 n.2.

[18] It is also reasonable to assume that Congress was aware well prior to the passage of the DMCA that the Supreme Court had made clear that the burden of proof for a fair use defense rests on the accused infringer. *See Campbell*, 510 U.S. at 590.

resetting of the balance is for Congress and not a court to strike.[19]

### ORDER

Because, for present purposes, "a knowing and material misrepresentation" is adequately pled, defendant's motion to dismiss is DENIED.

SO ORDERED.

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE

---

[19] Tuteur's tortious interference claim requires a similar showing of subjective bad faith.  The Complaint alleges that Crosley-Corcoran in causing BlueHost to remove her photograph from Tuteur's blog site "[was] acting with improper motive and/or improper means in causing harm to Dr. Amy [Tuteur] and preventing her exercise of contractual rights."  Compl. ¶ 78.  *See also United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 816 (1990) (adopting Restatement (Second) of Torts § 766 (1977)).  The quantum of proof necessary for a showing of subjective bad faith will, of course, vary depending on the circumstances of an individual defendant.  A greater showing may be required in the case of a legal naif like Crosley-Corcoran, a lesser one in the case of a legally sophisticated entity like the MPAA.